In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1175, 99-1224, 99-1261, and 99-1285

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KIYMIKO A. HARDIN, KEITH L. ROBINSON,
GREGORY SALLIS, and JOELL JORDAN,

Defendants-Appellants.

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 98-CR-60--Thomas J. Curran, Judge.

Argued January 7, 2000--Decided March 30, 2000

Before POSNER, Chief Judge, and ROVNER and EVANS,
Circuit Judges.

EVANS, Circuit Judge.  In addition to some
garden-variety issues, the appeal from this
multiweek, multidefendant drug trafficking trial
presents an interesting question about whether a
provision in the continuing criminal enterprise
statute is a mere penalty enhancement or an
element of the crime. On which side of the line
the item falls is rather important, of course. An
element of the crime must be charged in the
indictment, submitted to a jury, and proved
beyond a reasonable doubt. See, e.g., Jones v.
United States, 119 S. Ct. 1215, 1219 (1999). A
sentencing factor, by contrast, need not be set
forth in the indictment, may be decided by the
judge, and must be proved only by a preponderance
of the evidence or perhaps in extreme
circumstances by clear and convincing evidence.
See, e.g., Almendarez-Torres v. United States,
118 S. Ct. 1219, 1223 (1998); United States v.
Watts, 117 S. Ct. 633, 637 (1997).

The Supreme Court held in Jones that
subsections of the federal carjacking statute, 18
U.S.C. sec. 2119, that allow steeper penalties if
the crime resulted in serious bodily injury or
death must be treated as distinct elements of the
crime rather than as sentencing factors. 119 S.
Ct. at 1228. Jones has spawned a flurry of

challenges to other criminal laws from defendants across the country who argue that statutory provisions long assumed to be sentencing factors actually are elements. A handful of these appeals have been successful,/1 but most have not./2

In this case Keith L. Robinson brings a Jones-inspired attack on 21 U.S.C. sec. 848, the continuing criminal enterprise (CCE) statute. A jury found that Robinson had engaged in a continuing criminal enterprise as defined in sec. 848(c). In the district court, Judge Curran determined that Robinson satisfied sec. 848(b)(1) as a principal organizer and leader of the enterprise and sec. 848(b)(2)(A) because he was involved in trafficking at least 10 kilograms of crack cocaine (well in excess of the quantity required to trigger the statute). As called for by sec. 848(b), Judge Curran sentenced Robinson to life in prison.

Robinson, one of the four appellants in this case, argues that sec. 848(b)'s criteria regarding principal involvement and drug quantity constitute elements of the crime and are not mere sentencing factors within the purview of the judge. Though decisions on whether Jones applies to other laws are popping up every few weeks in the Federal Reporter, as of this writing this appears to be the first Jones challenge to the CCE statute.

Because this circuit previously said that sec. 848(b) is a sentencing enhancement provision, United States v. Kramer, 955 F.2d 479, 484 n.4 (7th Cir. 1992), and because Jones did not come down until after Robinson's trial and sentencing, it is no surprise that he did not mention this issue earlier. Nonetheless, by failing to raise the argument in the district court, Robinson can succeed on appeal only if (1) there was error, (2) the trial court's error was plain at the time of the appeal, and (3) the error affected Robinson's substantial rights. See United States v. Ross, 77 F.3d 1525, 1538-39 (7th Cir. 1996).

Whether a statutory provision constitutes a substantive element of the offense or a sentencing factor generally depends on what Congress intended; what Congress intended is determined by examining the statute's language, structure, subject matter, context, and history. See Almendarez-Torres, 118 S. Ct. at 1223.

The relevant portions of 21 U.S.C. sec. 848 read as follows:

(a) Penalties; forfeitures.  Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may

not be less than 20 years and which may be up to life imprisonment . . . except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 30 years and which may be up to life imprisonment . . . .

(b) Life imprisonment for engaging in continuing criminal enterprise. Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a), if--

(1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

(2)(A) the violation referred to in subsection (c)(1) involved at least 300 times the quantity of a substance described in subsection 401(b)(1)(B) of this Act [21 USCS sec. 841(b)(1)(B)], or

(B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 401(b)(1)(B) of this Act [21 USCS sec. 841(b)(1)(B)].

(c) "Continuing criminal enterprise" defined. For purposes of subsection (a), a person is engaged in a continuing criminal enterprise if--

(1) he violates any provision of this title or title III the punishment for which is a felony, and
(2) such violation is a part of a continuing series of violations of this title or title III--

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

The language of sec. 848(b) suggests that Congress intended it to be a sentencing enhancement, not an element of the crime. First, the title of the subsection--"Life imprisonment for engaging in continuing criminal enterprise"-- emphasizes sentencing. Second, the body of the

subsection does not define what it means to engage "in a continuing criminal enterprise." That definition is found in sec. 848(c), where Congress was most likely to have placed all the elements. Third, the phrase "shall be imprisoned" typically divides the (preceding) elements of the crime from the (subsequent) sentencing factors. What Robinson claims are elements fall on the wrong side of that boundary phrase.

The structure of sec. 848(b) indicates that it is intended to be a sentencing enhancement, not an element. Subsection (c) defines the crime. Subsection (a) lays out the basic sentencing range (20 years to life) and adds a sentencing enhancement (30 years to life) if the defendant has a prior drug conviction. Likewise, subsection (b) adds a sentencing enhancement (life) if the defendant was a key player in the CCE and if the CCE involved lots of drugs or a lot of profits. Reading subsections (a) and (b) as both sentencing provisions that rely on subsection (c) makes more sense than reading subsection (a) to rely in full on subsection (c), but reading subsection (b) to rely in part on subsection (c) and to stand in part on its own. This is bolstered by the language in sec. 848(b) that mirrors the wording in sec. 848(a). Subsection (a) begins: "Any person who engages in a continuing criminal enterprise shall be sentenced . . . ." Subsection (b) begins: "Any person who engages in a continuing criminal enterprise shall be imprisoned . . . ." This identical language suggests that, like subsection (a), subsection (b) is a penalty provision.

The subject matter of sec. 848(b) tilts in favor of a sentencing factor. Subsection (b) does not criminalize additional types of conduct, but mandates the maximum sentence for defendants whose behavior is an aggravated form of the basic conduct specified in subsection (c). A bigger penalty for someone who has a bigger role in a scheme involving a big amount of illegal drugs or a big amount of illicit profits looks more like a sentencing enhancement than a distinct substantive element. (At issue in Robinson's mandatory life sentence are level of involvement and quantity of drugs; the alternative factor in sec. 848(b)(2)(B) regarding the size of profits is not in play.)

Level of culpability has long been considered a sentencing factor. Two individuals convicted of the same crime generally will not receive identical sentences if one was more deeply enmeshed in the illegality than the other. "'Role in the offense' is a traditional determination, made in every sentencing, which long antedates the Guidelines." United States v. Schultz, 14

F.3d 1093, 1099 (6th Cir. 1994). The sentencing guidelines incorporate that tradition, bumping up the sentence of a defendant who played an aggravated role in the offense, see U.S.S.G. sec. 3B1.1, and shaving off a bit of time for a defendant who played a minimal part, see U.S.S.G. sec. 3B1.2. Surely the sort of sentencing factor properly created through congressional delegation to the Sentencing Commission, see Mistretta v. United States, 488 U.S. 361 (1989), also may be imposed directly by Congress.

Drug quantity also is a traditional sentencing factor. Under 21 U.S.C. sec. 841(b), the bigger the amount of illegal drugs, the bigger the penalty. "This court has held consistently that the quantity of drugs involved in a narcotics case does not constitute a substantive element of the drug offense." United States v. Trujillo, 959 F.2d 1377, 1381 (7th Cir. 1992). Were we to view the situation differently, we would, as noted last week, be embarking on a path that would lead to a "dubious destination." United States v. Jackson, 2000 WL 298575 (7th Cir. March 23, 2000).

The context of sec. 848(b) also supports the view that it is a penalty enhancement, not a substantive element. As explained in sec. 848(a), any defendant convicted on a CCE charge must be sentenced from 20 years to life in prison. Subsection (b) does not expose a defendant to greater punishment than he already might have received, but makes the existing maximum sentence the minimum sentence, as well, for a defendant who played an aggravated role in the CCE. The Supreme Court has sent mixed signals on whether a greater danger is posed by a provision that increases the mandatory minimum sentence or by a provision that increases the possible maximum sentence. Compare Almendarez-Torres, 118 S. Ct. at 1231 ("the risk of unfairness to a particular defendant is no less, and may well be greater, when a mandatory minimum sentence, rather than a permissive maximum sentence, is at issue"), with McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986) (defendants' argument that a provision is really an element of the offense "would have at least more superficial appeal" if the measure in question "exposed them to greater or additional punishment"). The bottom line is that the Supreme Court has treated both types of laws as sentencing factors, including measures like this one that trigger a minimum sentence that falls within the range already laid out in the statute. Id. at 87-93.

The legislative history offers further evidence that Congress meant sec. 848(b) to be a penalty enhancement. When added in 1986 to sec. 848,

which did not originally contain a mandatory life sentence, subsection (b) was titled "Continuing Criminal Enterprise Enhanced Penalties." Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, sec. 1253, 100 Stat. 3207. Lawmakers characterized the legislation as providing tough new penalties for drug dealers, not as creating new crimes. See, e.g., 132 Cong. Rec. 26834 (1986) (statement of Sen. Nunn) ("[t]he bill strengthens the penalties for major drug traffickers"); 132 Cong. Rec. 26835 (1986) (statement of Sen. Trible) ("it substantially increases the criminal penalties for drug dealers . . . . It is time for more vigorous law enforcement and for tougher penalties that will put major drug traffickers out of business forever. For that reason, I introduced legislation to impose life imprisonment on those convicted of continuing criminal enterprises involving large-scale drug trafficking"); 132 Cong. Rec. 31417 (1986) (statement of Sen. Byrd) ("it contains significantly enhanced penalties for drug crimes. It requires minimum mandatory sentences, with no parole, no probation. And it provides for life sentences for major criminals--the drug 'king pins'").

Robinson's argument relies on language from a footnote in Jones that says, "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." 119 S. Ct. at 1224 n.6. Following this phrase literally would produce indictments that are even more complex, make jury verdicts even more exhaustive, further constrict what little sentencing discretion is left to today's trial judges, transform the U.S. Code and the sentencing guidelines, and erase fresh Supreme Court precedent that allows sentencing courts to consider not only defendant conduct that the jury did not decide upon but also defendant conduct of which the defendant was acquitted, see Watts, 117 S. Ct. at 638.

Though we do not doubt the Supreme Court's willingness to undertake revolutionary change, we are skeptical that the Court would announce such an important legal metamorphosis halfway through a footnote halfway through an opinion that consists mostly of a fact-intensive analysis of a specific statute and that in the end punts on whether Congress meant the provision in question to be a sentencing factor or an element, but to play it safe treats the provision as an element. Other passages in Jones cast doubt on whether the footnote really means what it says. "It is not,

of course, that anyone today would claim that every fact with a bearing on sentencing must be found by a jury; we have resolved that general issue and have no intention of questioning its resolution." 119 S. Ct. at 1226. "[O]ur decision today does not announce any new principle of constitutional law." 119 S. Ct. at 1228 n.11.

Most other circuits have not adopted the breathtakingly sweeping interpretation of Jones that Robinson recommends. The Eleventh Circuit noted that "if any factor that increases the maximum penalty amounts to an element of the crime, the Court did not need to bother with determining whether or not Congress considered it an element." Hester, 2000 WL 11751 at *4. Consequently, Hester concluded that the Jones footnote applies only when a statute and its legislative history are unclear. Id. The Tenth Circuit called Jones "exceedingly narrow" and cabined its holding to the federal carjacking statute only. McGuire, 1999 WL 1244489 at *4. The D.C. Circuit said "[t]hat the Supreme Court had doubts about the constitutionality of the carjacking statute, doubts that it never had to resolve, is simply too thin a reed" to depart from prior circuit decisions interpreting a different statute as a sentencing factor. Williams, 194 F.3d at 105-06.

Unless the Supreme Court clarifies that its holding in Jones really is as broad as what Robinson urges, we are inclined not to turn the criminal justice system upside down, but rather join these circuits' more cautious reading of that decision. We reject Robinson's suggestions that sec. 848(b) contains a sprinkle of sentencing factor and a dash of definition of the elements. Instead, we hold that sec. 848(b) does not contain substantive elements that must be charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt, but rather embodies a sentencing enhancement that is within the purview of the judge. In short, there was no error here, plain or otherwise.

Even if the Jones footnote is taken at face value, Robinson would not be saved. The footnote says any fact "that increases the maximum penalty for a crime" must be in the indictment, go to the jury, and satisfy proof beyond a reasonable doubt. As discussed earlier, sec. 848(b) does not increase the maximum penalty for a CCE conviction, but rather imposes a mandatory minimum penalty within the sentencing range that is already outlined.

Furthermore, even if our analysis of sec. 848(b) is off the mark and Robinson's CCE conviction is negated, he would spend life in

prison anyway. The government would reinstate his conspiracy conviction, where his offense level of 48 would draw an automatic life sentence under the sentencing guidelines. Also, Robinson already was sentenced to life in prison on drug counts 3, 4, and 5.

A few loose ends regarding Robinson's CCE conviction remain. The first is whether Jones means that the drug quantities in 21 U.S.C. sec. 841(b) are elements rather than sentencing factors, a question we already considered and answered to the contrary in Jackson. The second loose end involves the CCE jury instructions, where Judge Curran told the jury that it must unanimously agree that Robinson participated in two or more violations of the federal narcotics law. Though, at the time, Judge Curran was correctly stating the law of the circuit, the Supreme Court subsequently ruled that the jury must unanimously agree on each of the specific, individual violations that comprise the CCE's "continuing series of violations." Richardson v. United States, 119 S. Ct. 1707 (1999). The Court also hinted that at least three violations might be required. Id. at 1710. The Supreme Court also recently held, however, that Federal Rule of Criminal Procedure 52(a)'s harmless error analysis applies to a jury instruction that omits an element of the offense. Neder v. United States, 119 S. Ct. 1827 (1999). We must decide whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Id. at 1838. By unanimously finding Robinson guilty of the drug offenses outlined in counts 3-6, the jury unanimously agreed on four specific, individual predicate felonies that made up the continuing series of violations required for a CCE conviction. The retrospective error in jury instructions was therefore harmless.

The third loose end is Robinson's claim that the jury also should have been told that it must unanimously agree on the identity of the "five or more other persons" with whom he was acting in concert. Robinson "acknowledges this is a difficult argument" and then does little to elaborate on it. Undeveloped arguments are waived. See JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 780-81 (7th Cir. 1999). Regardless, the Supreme Court said that the "five or more persons" provision is significantly different from the "continuing series of violations" provision and suggested that there was no unanimity requirement for the former. Richardson, 119 S. Ct. at 1713. We have held that the jury is not required to agree on the identity of the five individuals who a defendant managed or supervised. United States v.

Gibbs, 61 F.3d 536, 538 (7th Cir. 1995). That law stands, and so does Robinson's CCE conviction and life sentence under sec. 848(b).

We turn now to the raft of more familiar complaints raised by Robinson and his three appellate cohorts.

This appeal stems from the prosecution of a drug ring that moved large amounts of crack cocaine, powder cocaine, heroin, and marijuana from Los Angeles to Milwaukee, Minneapolis, and other cities across the country, where the drugs were sold. Fifteen individuals were indicted: two remained at large when this trial took place, nine pleaded guilty, and four went to trial. The trial, which lasted more than 2 weeks, ended when the jury found all four guilty on all counts. In addition to the CCE conviction, Robinson was convicted of conspiracy to possess and distribute crack cocaine, three counts of possession and distribution of crack cocaine, one count of possession and distribution of cocaine, and six other counts mostly dealing with firearms violations and money laundering. Gregory D. Sallis was convicted of conspiracy, one count of possession and distribution of crack cocaine, and one count of interstate travel in aid of a racketeering enterprise. Joell Jordan was convicted of conspiracy and five counts of using a communication facility to facilitate a drug conspiracy. Kiymiko A. Hardin was convicted of the drug conspiracy. As noted earlier, Robinson received a life sentence. Sallis was sentenced to 360 months in prison, Jordan to 168 months, and Hardin to 120 months.

Robinson and Sallis both challenge the sufficiency of the evidence against them. An insufficiency of the evidence argument is an uphill fight. United States v. Bradley, 165 F.3d 594, 595 (7th Cir. 1999). We do not second-guess the jury's weighing of the evidence or its assessment of the credibility of witnesses. See United States v. Hach, 162 F.3d 937, 942 (7th Cir. 1998). We affirm if, after viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id.

In an attack on his conspiracy conviction, Sallis concedes that he bought and sold drugs but distances himself from Robinson's particular outfit. What distinguishes a conspiracy from an agreement between a buyer and seller is that a conspiracy involves a further, often implicit, understanding between the buyer and seller, usually regarding the subsequent distribution of the drugs. See United States v. Clay, 37 F.3d

338, 341 (7th Cir. 1994). Signs of a conspiracy include a lengthy affiliation, an established method of payment, standardized transactions, a demonstrated level of mutual trust, and a seller who knows about and has a stake in the buyer's drug business. See United States v. Menting, 166 F.3d 923, 928 (7th Cir. 1999).

The evidence indicated that Sallis was not the independent agent he claims to be. Tresa McCormick, a seller in the organization, testified that at Robinson's direction she picked up her drugs on several occasions from Sallis, whom she saw packaging a large amount of crack. Another seller, Glen Huley, said that he and Sallis sold drugs that belonged to the organization's leaders--Robinson, Charles Henderson, and Nelson James--and that they would not have to pay for the drugs up front but could sell the drugs and return later with the profits. Larry Tender, one of Robinson's main operatives, testified that he put up couriers in an apartment after getting the keys to the apartment from Sallis. Eugene Ward said on two occasions when he bought crack from Robinson that Robinson was accompanied by Sallis. Katrina Louis, a courier, recounted that Sallis helped strap her with a belt of money that she transported from Milwaukee to Los Angeles. This evidence demonstrates that Sallis was more than a mere customer of Robinson's but, rather, had an ongoing, regular, integral role in the drug organization.

Robinson on counts 3-5 and Sallis on counts 1, 3, and 12 contend that the evidence identifying the particular drug involved as crack cocaine fell short. The defendants brand the witnesses who testified in this case as, in so many words, lying scumbag drug dealers who cannot be trusted because they got a break for cooperating. Unsavory characters might not make ideal witnesses, but in a drug trial the prosecution generally does not have the luxury of drawing its roster of witnesses from the College of Cardinals. It is not for an appellate panel to second-guess the jury's assessments of the credibility of witnesses. United States v. Griffin, 194 F.3d 808, 817 (7th Cir. 1999).

The defendants argue that the government failed to prove that the controlled substance involved in this case was indeed crack cocaine. We reject this claim. As we have observed, the people who transport, cook, cut up, bag, and sell crack are the sort of people who tend to know what crack is. See Bradley, 165 F.3d at 596 ("those who smoke, buy, or sell this stuff are the real experts on what is crack"). And here, numerous witnesses identified Robinson's organization as dealing primarily in crack (cocaine base)

cocaine. Courier Sharyea Jackson testified that she saw cocaine being cooked up prior to the drugs being packaged and taped to her body for transport from Los Angeles to Milwaukee. Courier Kimberly Jones said she saw a "big old square rock" being cooked before she smuggled the drugs beneath her clothes from Los Angeles to Milwaukee. Courier Jacquitta Brooks said the package she delivered contained a big, hard, cream-colored block that was cut into small balls after she made her delivery in Milwaukee. Eugene Ward admitted buying crack, as opposed to powder cocaine, from Robinson and then selling it.

Several witnesses were particularly persuasive in their understanding of what distinguishes crack cocaine from cocaine powder. Lamont Nelson, a Minneapolis drug dealer, described a visit from Robinson in which the two cooked half a kilogram of white powdery cocaine into crack cocaine, which looks like rock and can be smoked. Nelson explained that the crack cocaine product weighs more than the original cocaine powder because, during the process, baking soda is added using a blender. Glen Huley, who admitted helping to cook cocaine powder into crack, clarified that by "cocaine base" he meant the "rock form substance of cocaine." He, too, described the process of taking the powder form of cocaine, adding baking soda, cooking it on a stove, and producing the rock form of cocaine. Larry Tender, who helped weigh, bag, and sell the drugs, said that what he would refer to on the street as "crack" he described as "cocaine base" during the trial because he didn't think the jury members would "understand what crack is." And Tresa McCormick, who sold crack for Robinson for $800 an ounce, recounted how she weighed and packaged crack after first breaking it apart with her hands or with a hammer. She explained that crack is cocaine that is "cooked like with baking soda to make a hard rocky like substance, so it's like smokable. Get you a little higher than regular cocaine would."

We doubt a lab technician could define crack any more cogently or concisely. Robinson and Sallis complain that none of these witnesses testified to ever having used or tasted the crack themselves. But a cashier at Jewel doesn't have to bite off a piece of the customer's broccoli to know which vegetable she is ringing up. The identity of a controlled substance may be proved by circumstantial evidence, such as the purchase price, the secrecy of sales, and familiarity with the drug. See United States v. Dominguez, 992 F.2d 678, 681 (7th Cir. 1993); United States v. Marshall, 985 F.2d 901, 905 (7th Cir. 1993). Despite the lack of scientific evidence, a rational jury could have easily concluded from

the secrecy of the transportation process, the prices charged, and the witnesses' firsthand descriptions of cooking a white powdery substance into rocks that the substance involved was crack cocaine and not, as Sallis' brief rhetorically suggests, rock salt.

In finding Robinson guilty of the specific drug charges in counts 3-5 and Sallis guilty on count 3, the jury obviously determined that the drug involved was crack cocaine. Because of the precision of the indictment, however, we also believe that the jury found in the context of the conspiracy charge in count 1 that the drug involved was crack cocaine. This scuttles the sentencing complaints of Hardin and Jordan, as well as of Robinson and Sallis, all of whom seek resentencing on the ground that there was an inadequate basis to determine that crack was the controlled substance involved in this conspiracy.

This is not a case like Edwards v. United States, 118 S. Ct. 1475 (1998), where the jury found the defendant guilty of a conspiracy involving cocaine or cocaine base (i.e., crack) and then at sentencing the judge determined that crack was involved and imposed the resulting harsher penalties. Here, the first count of the indictment specifically charged the defendants with conspiring to distribute and possess with intent to distribute "controlled substances, specifically, in excess of fifty grams of cocaine base, commonly known as 'crack' cocaine." Granted, the jurors were instructed that the only two elements they needed to find beyond a reasonable doubt to convict the defendants on this count were that the conspiracy existed and that the particular defendant knowingly and intentionally became a member of the conspiracy. The jurors also were instructed, though, that if they found the defendant(s) guilty of a conspiracy, it had to be the conspiracy charged in count 1 of the indictment. In finding the defendants guilty on count 1, the jury therefore found the defendants guilty of trafficking "cocaine base, commonly known as 'crack' cocaine." And if the jury found all four defendants guilty beyond a reasonable doubt of conspiring to deal crack cocaine, then surely Judge Curran was on solid ground in deciding by a preponderance of the evidence that the controlled substance was crack cocaine and in sentencing the defendants accordingly.

On a related issue, Sallis contests the quantity of drugs that served as the basis for his sentence. Because he did not raise his objection at sentencing, we review for plain error Judge Curran's decision to hold him responsible for at least 1.5 kilograms of crack.

United States v. Hardamon, 188 F.3d 843, 848-49 (7th Cir. 1999). It was not plain error for Judge Curran to adopt the presentence report's recommendation that the weight of the crack exceeded 1.5 kilograms. See United States v. Vargas, 16 F.3d 155, 159 (7th Cir. 1994). As discussed earlier in assessing Sallis' sufficiency of the evidence argument, there was plenty of testimony from multiple witnesses that Sallis was deeply involved in this drug ring that was moving large quantities of crack.

   Moving on to the next issue, Robinson wants his convictions reversed because Sallis' trial counsel twice mentioned during closing arguments that Robinson had not testified. Pointing out a defendant's exercise of his Fifth Amendment right not to be a witness against himself is thought to compromise the right and therefore is forbidden. Griffin v. California, 380 U.S. 609, 615 (1965). A conviction is reversed, however, only if the reference was not harmless. United States v. Cotnam, 88 F.3d 487, 499-500 (7th Cir. 1996). Even though the prosecution is not at fault when a codefendant's attorney improperly comments on another defendant's failure to testify, as was the case here, the same harmless error standard controls. See United States v. Alpern, 564 F.2d 755, 761-62 (7th Cir. 1977); United States v. Hutul, 416 F.2d 607, 621-22 (7th Cir. 1969).

   Sallis' trial counsel first referred to Robinson's failure to testify while discussing count 12 of the indictment, an interstate travel charge under 18 U.S.C. sec. 1952(a)(3) against Sallis, Robinson, and Denise Betts-Guignard. He said:

And you have to think about the testimony that came in about that. And essentially, we didn't hear from Keith Robinson, Denise Betts-Guignard or Gregory Sallis, so we have to look at other people's testimony to determine what happened on that day . . . . [T]he main person who testified about that was Glen Huley. If you think back on Mr. Huley's testimony, and, again, I'm not going to belabor the fact that he cut a deal with the government, that he was proven to have lied repeatedly, that he lived a dishonest lifestyle before he came into this courtroom. All of that is apparent to you.

A few moments later, Sallis' lawyer discussed count 3 of the indictment, a drug charge against Sallis, Robinson, Nelson James, and Beverly Hendrix. He said:

[W]hat you're left with, because we haven't heard from Robinson, James, Hendrix or Sallis, is the evidence that the government has brought forth

through Sharyea Jackson and Kimberly Jones.

Robinson pins his Fifth Amendment argument on De Luna v. United States, 308 F.2d 140 (5th Cir. 1962), where a codefendant's attorney's repeated references to another defendant's failure to testify resulted in a finding of prejudicial error. In De Luna two men were on trial: Gomez proclaimed his innocence and pointed the finger at his codefendant (and cousin), de Luna,/3 who did not testify. At closing, Gomez's attorney said, "[A]t least one man was honest enough and had courage enough to take the stand and subject himself to cross examination, and tell you the whole story . . . . You haven't heard a word from this man (de Luna)." Id. at 142. De Luna only highlights how different--and innocuous--the situation was here: Sallis' and Robinson's defenses did not conflict. Sallis' attorney was not casting aspersions on those who did not testify (indeed, he noted that Sallis himself did not testify). Sallis' lawyer merely was arguing that there were a limited number of people who could testify about the crimes charged and the only witnesses who did so were unreliable. He could have been more careful, see United States v. Petullo, 709 F.2d 1178, 1182 (7th Cir. 1983) ("[c]aution is certainly indicated in these circumstances"), but his comments, viewed in the light of all the circumstances of this trial, were not any more than harmless to Robinson.

Next, all four defendants protest the admission of evidence that Robinson and others were part of the Crips, a Los Angeles-based gang. Robinson's and Sallis' pretrial objection to this evidence was overruled by Judge Curran, a decision we will reverse only upon a showing of a clear abuse of discretion by the judge. United States v. Butler, 71 F.3d 243, 250 (7th Cir. 1995). Gang affiliation is relevant where the interrelationship between people is a central issue. United States v. Thomas, 86 F.3d 647, 652 (7th Cir. 1996). Proving that interrelationships existed was necessary for the government to prove the drug conspiracy of which all four defendants were convicted. Charging a drug conspiracy that involves gang members, however, does give the government carte blanche to splash gang references throughout the trial. Gang evidence can arouse negative connotations and be unfairly prejudicial. Id.; United States v. Irvin, 87 F.3d 860, 865 (7th Cir. 1996).

The government insists that the gang evidence was necessary to show the connection between the members of this conspiracy, particularly how the coconspirators first got to know each other and how Robinson kept lower-level gang members in line. The defendants question what relevance

affiliation with a Los Angeles gang has to activities alleged to have occurred in Milwaukee. The defendants also argue that the references to the Crips were prejudicial because that gang is particularly notorious in popular lore. Naming the Crips as the specific gang involved was superfluous and probably should have been avoided. See United States v. Abel, 469 U.S. 45, 54 (1984) (not naming the Aryan Brotherhood as the gang involved was one reason why gang reference was not unduly prejudicial). Beyond getting various witnesses to identify other individuals involved in this drug ring as Crips, the prosecution did little to develop their theory that the connections between gang members demonstrated connections in the drug distribution conspiracy. Nonetheless, the gang relationships suggested that the players in this story were linked. Cf. Irvin, 87 F.3d at 864 (gang evidence gratuitous because conspiracy not charged and joint venture did not need to be proved). Though the defendants suggest the mere utterance of the name "Crips" sent shudders down every juror's spine, there was no insinuation at trial that the Crips are a particularly big and bad gang. Furthermore, in a 12-day trial involving 42 witnesses, there were only 7 references to the Crips and 2 additional generic gang references. Though we do not see much probative value in this gang evidence, we also don't see great danger of unfair prejudice. In light of the cautionary jury instruction and the wealth of other evidence, the admission of these scattered gang references was not a clear abuse of discretion and--even if it were--was harmless.

Finally, Sallis and Hardin say they were prejudiced by being tried jointly with Robinson. Sallis is bringing up this issue for the first time on appeal; Hardin filed a pretrial severance motion based solely on Bruton v. United States, 391 U.S. 123 (1968), grounds. Because neither defendant has shown cause for not raising this particular joint trial concern in the district court, we review only for plain error. United States v. Gio, 7 F.3d 1279, 1285 (7th Cir. 1993).

If it appears a defendant is prejudiced by a joint trial, the judge may order separate trials. Federal Rule of Criminal Procedure 14. The defendant must show that without severance he was unable to obtain a fair trial, not merely that his chance of acquittal would have been higher at a separate trial. United States v. Thornton, 197 F.3d 241, 255 (7th Cir. 1999). Joint trials are encouraged when a group of people are charged with participating in the same crime because the economies of a single trial in all but the most unusual circumstances outweigh the danger of prejudice to the least guilty or possibly the

prejudice to all defendants because of sheer confusion. United States v. Velasquez, 772 F.2d 1348, 1352 (7th Cir. 1985). We presume that the jury capably sorts through the evidence and follows the instructions, such as the one given by Judge Curran, to give separate consideration to each defendant. Thornton, 197 F.3d at 256. The classic situations where failure to sever may be prejudicial involve the admission of damaging evidence at a joint trial that would be inadmissible if the defendant were being tried alone or the exclusion at a joint trial of exculpatory evidence that would be available if the defendant were being tried solo. Id. Sallis and Hardin argue their situation fits the former scenario because the bulk of the evidence in this case pertained to Robinson, the ringleader. Joint trials do create the danger that the little fish will be lumped together with the big fish. See United States v. McAnderson, 914 F.2d 934, 949 (7th Cir. 1990). Conversely, though, joint trials might make the little fish's activities, though criminal, appear minor in comparison and consequently result in acquittal. See Thornton, 197 F.3d at 256.

Because both Sallis and Hardin were charged with conspiracy, much of the evidence they found objectionable in the joint trial would have been admissible at separate trials anyway. Conspirators are on the hook for foreseeable acts of coconspirators that are in furtherance of the conspiracy. See Hach, 162 F.3d at 951 (7th Cir. 1998). Sallis' perfervidly argued small fish theory is especially hard to swallow. As shown by our earlier discussion of his insufficiency of the evidence argument, he was no bit player in this drug ring.

Hardin's claim is more plausible and evokes more sympathy, since she was only a low-level courier who ended up with a mighty stiff sentence. Nevertheless, ferrying drugs to Milwaukee and drug money back to Los Angeles might not be as bad as orchestrating the business, but it is illegal and it makes one part of the conspiracy. Larry Tender, Glen Huley, and LaQuita Hampton all identified Hardin as a drug courier. Tender described three occasions when he met Hardin in Milwaukee upon her arrival from Los Angeles to receive the packages of crack cocaine she had transported. Sharyea Jackson testified she and Hardin made trips to Los Angeles, each carrying a concealed money belt. Hardin challenges the reliability of these witnesses, all of whom cooperated with the government and received more lenient sentences. But credibility is a call for the jury, not us. At any rate, these witnesses would not have been any more or less credible had they testified at a trial where

Hardin was being tried alone.

The jury found all four defendants guilty of all counts charged, but in their next round of deliberations reduced to $2,400 the $1 million forfeiture sought by the government from Hardin. By contrast, the jury imposed the $1 million forfeiture the government sought against Robinson, Sallis, and Jordan. A mixed verdict on the actual charges is more telling, see Thornton, 197 F.3d at 256, but variance in a forfeiture decision also indicates that the jury considered the evidence against each defendant individually. Given this factor, the cautionary instruction the jury received, and the weight of the evidence against both Sallis and Hardin individually, we do not believe that it was plain error to try them jointly with Robinson and Jordan.

We affirm the convictions and sentences entered in the district court against all four defendants.

/1 See United States v. Terence Earl Davis, 2000 WL 6132 (4th Cir. 2000) (destruction of property or a dwelling or destruction of property that jeopardizes a person's life is an element in 18 U.S.C. sec. 1363); United States v. John Alvin Davis, 184 F.3d 366, 367 (4th Cir. 1999) (great bodily injury is an element in South Carolina law regarding failure to stop when signaled by a law enforcement officer); United States v. Allen, 190 F.3d 1208 (11th Cir. 1999) (intending to use object as a weapon is an element in 18 U.S.C. sec. 1791(d)(1)(B)); United States v. Nunez, 180 F.3d 227, 233 (5th Cir. 1999) (resisting arrest by federal officer by more than simple assault or with a dangerous weapon is an element in 18 U.S.C. sec. 111). See also United States v. Chestaro, 2000 WL 16411 (2d Cir. 1999) (using a deadly and dangerous weapon or inflicting serious bodily injury is an element in 18 U.S.C. sec. 111(b) and therefore defendant's double jeopardy violation claim is rejected).

/2 See United States v. Jackson, 2000 WL 298575 (7th Cir. March 23, 2000) (quantity of drugs is a sentencing factor in 21 U.S.C. sec. 841); United States v. Swiney, 2000 WL 149457, at *8 n.5 (6th Cir. 2000) (same); United States v. Hester, 199 F.3d 1287, 2000 WL 11751, *5 (11th Cir. 2000) (same); United States v. Carless Jones, 194 F.3d 1178, 1183-86 (10th Cir. 1999) (same); United States v. Williams, 194 F.3d 100, 105-07 (D.C. Cir. 1999) (same); United States v. McGuire, 1999 WL 1244489, *3-5 (10th Cir. 1999) (serious bodily injury is a sentencing factor under U.S.S.G. sec. 2B3.1(b)(3)(B)); United States v. Cruz-Guerrero, 194 F.3d 1029 (9th Cir. 1999) (carrying a gun during commission of a felony is a sentencing

factor in California law); United States v. Kaluna, 192 F.3d 1188, 1196 (9th Cir. 1999) (exception to the definition of a strike that could prevent stiffer penalty under three-strikes law is part of a sentencing factor in 18 U.S.C. sec. 3559(c)(3)(A)); United States v. Eads, 191 F.3d 1206, 1214 (10th Cir. 1999) (type of firearm is a sentencing factor in 18 U.S.C. sec. 924(c)(1)); United States v. Castillo, 179 F.3d 321, 328 (5th Cir. 1999) (same); United States v. Baldwin, 186 F.3d 99, 102 (2d Cir.) (existence of prior felony convictions is a sentencing factor in 18 U.S.C. 924(e)), cert. denied, 120 S. Ct. 558 (1999); United States v. Matthews, 178 F.3d 295, 302 (5th Cir.) (involvement in a criminal street gang is a sentencing factor in 18 U.S.C. sec. 521), cert. denied, 120 S. Ct. 559 (1999).

/3 The caption of the case names the defendant as Carlos Garza De Luna. In the body of the opinion, however, he is called Carlos Garza de Luna.