# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3109

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANNY TURNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 08 CR 22—**Barbara B. Crabb**, *Judge.*

On Remand from
The Supreme Court of the United States

SUBMITTED AUGUST 21, 2012—DECIDED MARCH 4, 2013

Before ROVNER and EVANS[*], *Circuit Judges*, and VAN BOKKELEN, *District Judge.*[**]

ROVNER, *Circuit Judge.*    Defendant-appellant Danny Turner was charged with three counts of distributing cocaine base premised on multiple sales of crack cocaine he made to an undercover police officer. *See* 21 U.S.C. § 841(a)(1); *DePierre v. United States*, 131 S. Ct. 2225, 2237 (2011). Amanda Hanson, the crime laboratory chemist who analyzed the substances that Turner distributed to the officer and confirmed that they contained cocaine base, was on maternity leave at the time of Turner's trial. Over Turner's objection, the supervisor who peer reviewed her work, Robert Block, testified as an expert, opining based on the data produced by Hanson that the substances contained cocaine base. R. 60 at 51. Importantly, Block also testified that Hanson had followed standard testing procedures in analyzing the substances and that he reached the same conclusion that Hanson had as to the nature of those substances. R. 60 at 50, 51. The jury convicted Turner on all three distribution charges, and the district court ordered him to serve a prison term of 210 months.

Three years ago, we affirmed Turner's conviction, rejecting his argument (among others) that Block's testi-

---

[*] Circuit Judge Evans died on August 10, 2011, and did not participate in the decision of this case on remand from the Supreme Court. The case is now being resolved by a quorum of the panel pursuant to 28 U.S.C. § 46(d).

[**]   Of the United States District Court for the Northern District of Indiana, sitting by designation.

mony regarding another chemist's analysis violated the Confrontation Clause of the Sixth Amendment. *See United States v. Turner*, 591 F.3d 928, 932-34 (7th Cir. 2010). Turner thereafter filed a petition for a writ of certiorari, renewing his Sixth Amendment argument. That petition remained pending until the Supreme Court rendered its decision last summer in *Williams v. Illinois*, 132 S. Ct. 2221 (2012). The Court then granted Turner's petition for certiorari, vacated our decision, and remanded for reconsideration in light of *Williams*. *Turner v. United States*, 133 S. Ct. 55 (2012).

We begin by noting that the 4-1-4 division of the Justices in *Williams*, with one Justice—Justice Thomas—concurring in the result but no portion of the plurality's reasoning,[1] makes it somewhat challenging to apply *Williams* to the facts of this case. As the dissenting opinion in *Williams* observes, the divergent analyses and conclusions of the plurality and dissent sow confusion as to precisely what limitations the Confrontation Clause may impose when an expert witness testifies about the results of testing performed by another analyst, who herself is not called to testify at trial. *See* 132 S. Ct. at 2277 (Kagan, J., dissenting).

At the least, however, the *Williams* decision (which we discuss in more detail below) casts doubt on

---

[1] Justice Breyer also wrote a concurrence in *Williams*, but in contrast to Justice Thomas, he joined the plurality's opinion in full. *See* 132 S. Ct. at 2244-45, 2252 (Breyer, J., concurring). For ease of discussion, when we refer to the concurrence in *Williams*, we are referring to Justice Thomas's concurrence.

using expert testimony in place of testimony from an analyst who actually examined and tested evidence bearing on a defendant's guilt, insofar as the expert is asked about matters which lie solely within the testing analyst's knowledge. Consequently, to the extent Block testified about anything that Hanson, the absent chemist, did or concluded in testing the substances that Turner distributed to the undercover officer, his testimony may have violated Turner's rights under the Confrontation Clause.

In their Circuit Rule 54 statements, the parties have taken divergent positions as to what course of action this court should follow in view of the *Williams* decision. The government continues to argue that the admission of Block's testimony did not violate Turner's rights under the Confrontation Clause, even when the *Williams* decision is taken into account. Primarily, however, the government contends that any conceivable Confrontation Clause error was harmless, such that we should again affirm Turner's conviction. Turner, not surprisingly, sees *Williams* as support for his contention that the admission of Block's testimony violated the Confrontation Clause. He contends that the error requires us to vacate his conviction and to remand for a new trial.

For the reasons set forth below, we conclude that any Confrontation Clause error that occurred during Block's testimony was harmless beyond a reasonable doubt. Only two aspects of Block's testimony potentially present a Confrontation Clause problem: Block's testimony

that Hanson followed standard procedures in testing the substances that Turner distributed to the under-cover officer, and his testimony that he reached the same conclusion about the nature of the substances that Hanson did. In both respects, Block necessarily was relying on out-of-court statements contained in Hanson's notes and report. These portions of Block's testimony strengthened the government's case; and, conversely, their exclusion would have diminished the quantity and quality of evidence showing that the substances Turner distributed comprised cocaine base in the form of crack cocaine. However, apart from Block's testimony, there was other evidence indicating that the substances were crack cocaine, and Turner himself did not contest that they were, in fact, crack cocaine. We are therefore confident that any error did not affect the outcome of the trial.

To begin, we note that the bulk of Block's testimony was permissible. Block testified as both a fact and an expert witness. In his capacity as a supervisor at the state crime laboratory, he described the procedures and safeguards that employees of the laboratory observe in handling substances submitted for analysis. He also noted that he reviewed Hanson's work in this case pursuant to the laboratory's standard peer review procedure. As an expert forensic chemist, he went on to explain for the jury how suspect substances are tested using gas chromatography, mass spectrometry, and infrared spectroscopy to yield data from which the nature of the substance may be determined. He then opined, based on his experience and expertise, that the data Hanson had produced in testing the substances that Turner dis-

tributed to the undercover officer—introduced at trial as Government Exhibits 1, 2, and 3—indicated that the substances contained cocaine base.

Q. So are you able—were you able to form any opinion as to the nature of the substance in those three exhibits?

A. Yes, I was.

Q. And what's your opinion?

A. My opinion based on the examinations that were performed on the chunky materials within Exhibits 1, 2, and 3, along with my experience, is that each of these items in 1, 2, and 3 contain cocaine base.

R. 60 at 51.

As we explained in our prior decision, an expert who gives testimony about the nature of a suspected controlled substance may rely on information gathered and produced by an analyst who does not himself testify. 591 F.3d at 932 (citing *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008)). Pursuant to Federal Rule of Evidence 703, the information on which the expert bases his opinion need not itself be admissible into evidence in order for the expert to testify. *Id.* (quoting and citing *Moon*, 512 F.3d at 361-62). Thus, the government could establish through Block's expert testimony what the data produced by Hanson's testing revealed concerning the nature of the substances that Turner distributed, without having to introduce either Hanson's documentation of her analysis or testimony from Hanson herself. *Id.* And because the government did not introduce Hanson's report, notes, or test results into evidence, Turner

was not deprived of his rights under the Sixth Amendment's Confrontation Clause simply because Block relied on the data contained in those documents in forming his opinion. *Id.* at 932-33.

Nothing in the Supreme Court's *Williams* decision undermines this aspect of our decision. On the contrary, Justice Alito's plurality opinion in *Williams* expressly endorses the notion that an appropriately credentialed individual may give expert testimony as to the significance of data produced by another analyst. 132 S. Ct. at 2233-35.[2] Nothing in either Justice Thomas's concurrence or in Justice Kagan's dissent takes issue with this aspect of the plurality's reasoning. Moreover, as we have indicated, Block in part testified in his capacity as Hanson's supervisor, describing both the procedures and safeguards that employees of the state laboratory are expected to follow and the steps that he took to peer review Hanson's work in this case. Block's testimony on these points, which were within his personal knowledge, posed no Confrontation Clause problem.[3]

---

[2] *See, e.g.*, 132 S. Ct. at 2233 ("It has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts.").

[3] We stated in our previous decision that because Block was a laboratory supervisor whose job was to review Hanson's work, he could properly testify that, as a result of his review of Hanson's test results in this case, he agreed with her conclu-

(continued...)

But the *Williams* decision arguably casts doubt on the two aspects of Block's testimony that we flagged above. Because it was Hanson who actually tested the substances that Turner distributed to the undercover officer, only she could testify as to the process she followed in testing those substances and as to the results of her own analysis. As we have noted, Hanson's notes, test results, and written report were not admitted into evidence, and so this case does not present the particular type of Confrontation Clause problem that the Supreme Court addressed in *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), and *Melendez-Diaz v. Massa-*

---

[3] (...continued)
sion as to the nature of the substances that Turner distributed. 591 F.3d at 933. We went on to note that even if it was error to allow Block to mention that he reached the same conclusion that Hanson had, the error was harmless: Block only mentioned Hanson's conclusion in passing; and it was clear that Block independently arrived at his own conclusion as to the nature of the tested substances. *Id.*

It is worth reiterating here that this portion of Block's testimony was quite brief. Moreover, even if Block had not referenced Hanson's conclusion, the jury might well have inferred from Block's legitimate testimony about the peer review he conducted of Hanson's work that he concurred in her conclusion as to the nature of the substances.

Nonetheless, in order to give Turner the benefit of every doubt, we proceed from the premise that this aspect of Block's testimony was impermissible under the Confrontation Clause.

*chusetts*, 557 U.S. 305, 129 S. Ct. 2527 (2009), where, by contrast, the analysts' reports were introduced at trial. But Block himself did effectively repeat the out-of-court statements made by Hanson in these written materials when he testified that Hanson had followed standard procedures in testing the substances and that he reached the same conclusion based on the resulting data that Hanson had—i.e., that the substances contained cocaine base. Block had no firsthand knowledge of either of these points; he was relying on what Hanson had written about her analysis. R. 60 at 50-51. In this way, Block's testimony put Hanson's out-of-court statements before the jury, and the jury was invited to consider these statements for their truth: that Hanson had followed standard procedures in analyzing the substances, and that she, like Block, had determined the substances to contain cocaine base.

The ramifications of introducing such out-of-court statements through an expert is the subject that so sharply divided the Court in *Williams*. The statement at issue in *Williams* was an expert witness's assertion that a DNA profile produced by a private laboratory had been derived from swabs of biological material taken from a sexual assault victim. The witness, an expert in forensic biology and DNA analysis, was called primarily to opine that the DNA profile produced by the laboratory matched the defendant's DNA profile. She had not played any role in deriving a DNA profile from the material taken from the assault victim, and thus had no personal knowledge of what that DNA profile was based on; she could only have been relying on the out-of-court statements set forth in the report of

the laboratory which prepared the profile. Notably, the analyst who prepared that report never testified. The four-member plurality posited that the expert, in speaking to the source of the DNA, was merely stating an assumption underlying her opinion that one DNA profile matched the other, rather than repeating, for its truth, the laboratory's out-of-court statement as to where the DNA profile it produced came from. 132 S. Ct. at 2236. But this view did not command a majority of the Court's Justices. Both the concurrence and the dissent maintained that the expert's testimony as to the source of the DNA tested by the laboratory was admitted for its truth, thus depriving the defendant of his rights under the Confrontation Clause. *See id.* at 2256-59 (Thomas, J., concurring in the judgment); *id.* at 2266-70 (Kagan, J., dissenting). The dissent made the case succinctly:

> Under our Confrontation Clause precedents, this is an open-and-shut case. The State of Illinois prosecuted Sandy Williams for rape based in part on a DNA profile created in Cellmark's laboratory. Yet the State did not give Williams a chance to question the analyst who produced that evidence. Instead, the prosecution introduced the results of Cellmark's testing through an expert witness who had no idea how they were generated. That approach—no less (perhaps more) than the confrontation-free methods of presenting forensic evidence we have formerly banned—deprived Williams of his Sixth Amendment right to "confron[t] . . . the witnesses against him."

*Id.* at 2265; *see also id.* at 2245 (Breyer, J., concurring).

Much the same could be said in this case. The government prosecuted Turner based in part on the Wisconsin Crime Laboratory's analysis of the substances that Turner distributed to the undercover officer. Yet, the government did not give Turner an opportunity to question the chemist, Hanson, who produced the data indicating that the substances contained cocaine base. Instead, the government introduced the result of Hanson's analysis through an expert witness, Block, and allowed him to vouch for the reliability of Hanson's work notwithstanding the fact that he did not participate in the handling and analysis of the substances and thus had no direct knowledge of what Hanson did or did not do. If there was a weakness in the work that Hanson performed, Turner was deprived of the opportunity to air it. *See Bullcoming*, 131 S. Ct. at 2715.

We must also acknowledge that at least two aspects of this case distinguish it from *Williams*, in ways that add force to the argument that a Confrontation Clause violation occurred.

First, whereas the purpose of the laboratory DNA profile at issue in *Williams* was not, in the plurality's view, "to accuse petitioner or to create evidence for use at trial," 132 S. Ct. at 2243, that was indeed the purpose of the analysis that Hanson performed. The substances that Hanson analyzed had been taken from a known individual, Turner, as part of an undercover investigation that targeted him; Turner already had been arrested and charged by the time Hanson tested the substances; and Hanson's analysis was commissioned in

order to establish Turner's guilt of distributing crack cocaine. This places Hanson's out-of-court statements squarely within the heartland of Confrontation Clause jurisprudence.

Second, this case was tried to a jury rather than to the bench, increasing the odds that the jury might have relied on the out-of-court statements embedded within Block's testimony for their truth. *See* 132 S. Ct. at 2236 (plurality) (noting that "[t]he dissent's argument would have force if petitioner had elected to have a jury trial").

There is a third circumstance which, in Turner's view, further distinguishes the facts of this case from those of *Williams*: Hanson's report—a one-page summary of her findings—was certified. By contrast, the DNA report at issue in *Williams* was not certified; and this was a point that Justice Thomas found dispositive. The fact that the report was neither sworn nor certified, in his view, indicated that the report lacked sufficient formality and solemnity to make the report testimonial, and therefore the statements in the report did not implicate the Confrontation Clause. 132 S. Ct. at 2260 (Thomas, J., concurring); *see id.* at 2259 ("[t]he text of the Confrontation Clause . . . applies to witnesses against the accused—in other words, those who bear testimony") (quoting *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364 (2004) (internal quotation marks deleted)). By contrast, when an analyst certifies his report, he is formally attesting that the findings set forth in the report, and any statements as to what steps he took to reach those findings, accurately reflect the

testing process he followed and the results he obtained. *Id.* at 2260. In Justice Thomas's view, making attestations of that nature render a sworn or certified report more similar to affidavits, depositions, and other formalized statements that traditionally have been treated as testimonial for purposes of the Confrontation Clause. *Id.* at 2260-61. No other member of the Court attached significance to this factor; indeed, the four dissenting Justices expressly rejected the notion that something like a DNA report must be certified before the statements contained in the report may be treated as testimonial statements for purposes of the Confrontation Clause. *Id.* at 2276-77 (Kagan, J., dissenting). Nonetheless, it seems clear that if the report at issue in *Williams* had been certified, Justice Thomas would have voted with the dissenting Justices to reverse the conviction, and the outcome of the case would have been different. Turner thus argues that certification ought to affect the outcome here.

Yet, although Hanson's report was certified, it was not certified in the sense that Justice Thomas deemed relevant. A designee of the Wisconsin Attorney General simply certified the report "to be a true and correct report of the findings of the State Crime Laboratory on the items examined as shown by this report." Turner's Separate Appendix (filed Jan. 16, 2009) at 49. Hanson herself did sign the report, and Block placed his initials above her signature, but in doing so neither Hanson nor Block certified anything. By contrast, in *Bullcoming*, when the forensic laboratory analyst who had tested the defendant's blood sample certified his report documenting the defendant's blood-alcohol level,

he expressly affirmed that "[t]he seal of th[e] sample was received intact and broken in the laboratory, that the statements in [the analyst's block of the report] are correct, and that he had followed the procedures set out on the reverse of th[e] report." 131 S. Ct. at 2710 (internal quotation marks omitted). Additionally, the examiner who had reviewed the testing analyst's work certified that the analyst "was qualified to conduct the [blood-alcohol concentration] test, and that the established procedure for handling and analyzing Bullcoming's sample ha[d] been followed." *Id.* at 2711. Here, Block did initial the report, but as with Hanson, he did not purport to make any comparable certification by doing so.

That said, Hanson's report was both official and signed, it constituted a formal record of the result of the laboratory tests that Hanson had performed, and it was clearly designed to memorialize that result for purposes of the pending legal proceeding against Turner, who was named in the report. In those respects, the report arguably is the functional equivalent of the report at issue in *Bullcoming*. *See Williams*, 132 S. Ct. at 2276 (dissent) (criticizing concurrence's reliance on lack of certification as a basis for distinguishing *Bullcoming*); *see also Bullcoming*, 131 S. Ct. at 2717 (discussing why signed but unsworn report can still qualify as testimonial for purposes of Confrontation Clause).

Recognizing that the divided nature of the *Williams* decision makes it difficult to predict how the Supreme Court would treat Hanson's report, and in order to give Turner the benefit of the doubt, we shall assume

that the nature of the report, particularly insofar as it formally documented Hanson's findings for purposes of the criminal case against Turner, is sufficiently testimonial to trigger the protections of the Confrontation Clause. We shall therefore assume that Block's testimony in fact did violate Turner's confrontation rights to the extent he disclosed that Hanson had determined the tested substances to contain cocaine base, as memorialized in her report.

Apart from Hanson's final report, we know next to nothing about the nature of her notes, raw test results, and any other documents that Block reviewed in forming his opinion that the substances contained cocaine base. Those documents are neither in the record nor reproduced in the briefing; all we have is a copy of Hanson's final, one-page report. There is no suggestion that either Hanson's notes or any other document she produced was sworn, certified, or in any other way formalized in a way that might make the statements set forth therein testimonial for purposes of the Confrontation Clause. The case for treating them as such, therefore, may have less force than the argument that the contents of Hanson's report were testimonial. These additional materials are nonetheless significant in the sense that they document what steps Hanson took in testing the substances that Turner distributed to the undercover officer; and they no doubt were the basis for Block's testimony that Hanson had followed standard testing processes in performing her analysis. However informal they may have been, then, Turner had a keen interest in having Hanson herself testify so that she

could be questioned about the statements in those documents. *See Williams*, 132 S. Ct. at 2267-68 (dissent); *Bullcoming*, 131 S. Ct. at 2715-16 & n.7.

Assuming for all of these reasons that the district court did err in allowing Block to testify about the procedures Hanson followed and as to what she concluded, we must nonetheless affirm Turner's conviction if the Confrontation Clause violation was harmless beyond a reasonable doubt. 28 U.S.C. § 2111; Fed. R. Crim. P. 52(a); *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436 (1986); *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967); *see also United States v. Dickerson*, 2013 WL 238725, at *6 (7th Cir. Jan. 23, 2013). "Whether an error is harmless beyond a reasonable doubt depends upon factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradictory evidence and the overall strength of the prosecution's case." *United States v. Walker*, 673 F.3d 649, 658 (7th Cir. 2012) (internal quotation marks and citations omitted).

The only aspect of the case affected by the asserted Confrontation Clause error was the proof that the substances Turner distributed to undercover Officer Kim Meyer contained cocaine base. When Block relied on Hanson's out-of-court statements to testify that she followed standard procedures in testing the substances and reached the same conclusion that he did as to what the data meant, Turner was deprived of the opportunity to probe Hanson's methodology and to expose potential

flaws in her analysis. In short, because he could not question Hanson herself, Turner lacked the opportunity to challenge her conclusion, and for that matter Block's conclusion (which was based on Hanson's data), that the substances contained cocaine base.

Yet, expert analysis and testimony are not invariably necessary to establish the identity of the controlled substance which the defendant is charged with distributing. *See United States v. Sanapaw*, 366 F.3d 492, 496 (7th Cir. 2004); *United States v. Hardin*, 209 F.3d 652, 661-62 (7th Cir. 2000), *overruled on other grounds by United States v. Nance*, 236 F.3d 820 (7th Cir. 2000); *United States v. Dominguez*, 992 F.2d 678, 681 (7th Cir. 1993); *United States v. Marshall*, 985 F.2d 901, 905 (7th Cir. 1993); *United States v. Manganellis*, 864 F.2d 528, 541 (7th Cir. 1988); *United States v. Lawson*, 507 F.2d 433, 438-39 (7th Cir. 1974), *overruled on other grounds by United States v. Hollinger*, 553 F.2d 535 (7th Cir. 1977); *see also United States v. Sweeney*, 688 F.2d 1131, 1145-46 (7th Cir. 1982). "Just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics." *Lawson*, 507 F.2d at 438 (quoting *United States v. Agueci*, 310 F.2d 817, 828 (2d Cir. 1962)); *see also Hardin*, 209 F.3d at 662; *Dominguez*, 992 F.2d at 681; *Manganellis*, 864 F.2d at 541. "Circumstantial evidence establishing identification may include a sales price consistent with that of [crack] cocaine; the covert nature of the sale; on-the-scene remarks by a conspirator iden-

tifying the substance as a drug; lay-experience based on familiarity through prior use, trading, or law enforcement; and behavior characteristic of drug sales." *Dominguez*, 992 F.2d at 681 (citing *Manganellis*, 864 F.2d at 541).

A review of the trial record reveals that there was considerable evidence beyond the objectionable portions of Block's testimony indicating that the substance that Turner distributed to Officer Meyer was crack cocaine, a form of cocaine base. *See DePierre v. United States*, *supra*, 131 S. Ct. at 2237.

First, Meyer described the substance that Turner gave to her during each of the three transactions she conducted with him as being crack cocaine or "suspect" crack cocaine. *E.g.*, R. 70 at 41, 46, 54. Meyer, who had been a police officer for three years, had been working with the Dane County Narcotics and Gang Task Force for approximately eighteen months. In her capacity as an undercover officer, one of her tasks was to purchase narcotics, which she had done on more than fifty occasions. R. 70 at 34, 36. She was thus well suited to know what crack cocaine looked like. Moreover, although Meyer did not testify in detail as to her conversations with Turner, and the recordings of those conversations were not offered into evidence at trial, the import of Meyer's testimony was that she contacted Turner—who went by the street name of "Face"—for the express purpose of buying crack cocaine from him. *E.g.*, R. 70 at 43.

Second, the testimony indicated that the price of $100 Meyer paid Turner on each of the three occasions

she dealt with him was consistent with the prices charged for crack cocaine. Meyer was familiar with the street price of crack cocaine, R. 70 at 35, testifying that an "eight-ball" of crack cocaine, which would be a quantity of approximately three and one-half grams, would normally sell for $150; the $100-quantities that she purchased from Turner were therefore a bit less than an eight-ball quantity. R. 70 at 47. Meyer added that she had a conversation with Turner following the second transaction about buying additional amounts from him. She asked him how much he would charge her for "two," meaning two eight-ball quantities, and he told her "two and a half," which she took to mean $250. R. 70 at 46.

Third, the witnesses' description of the substances that Turner distributed to Meyer was consistent with the appearance of crack cocaine. Detective Kevin Hughes, who worked with Meyer during each of the three transactions and on each occasion took custody of the substance she had purchased from Turner, described the substances involved in the first two transactions as "off-white" and "chalky," R. 60 at 12, 14, which is consistent with the appearance of crack cocaine. As for the third transaction, Meyer described the substance that Turner gave her on the occasion of the third transaction as a "chunk," R. 70 at 54, which is also consistent with the character of crack cocaine. Likewise Block, in describing the appearance of Government Exhibits 1 through 3, which contained the narcotics that Turner distributed to Meyer during the three purchases, indicated that all three exhibits contained "an off-white chunky material." R. 60 at 49. And, of course, Government Exhibits 1 through 3 were

in evidence, so the jury itself was able to observe the substances and confirm that they appeared as the witnesses had described them.

Fourth, Hughes testified that he conducted a presumptive field test of the substance that Turner distributed to Meyer during the first transaction in order to detect the presence of cocaine base; and he indicated that the test was positive. R. 60 at 12. Hughes did not elaborate on the nature of the field test, but his testimony on that point tends to verify, apart from the laboratory's independent, confirmatory analysis, that the substance contained cocaine base.

Fifth, Block permissibly testified that the substances contained in Government Exhibits 1 through 3 had been submitted to the state crime laboratory for testing, R. 60 at 47-48, and that the data produced by Hanson's testing of those substances indicated, in his expert opinion, that they contained cocaine base, R. 60 at 51. These permissible aspects of Block's testimony, coupled with the other evidence we have noted, was more than sufficient to show beyond a reasonable doubt that Turner distributed crack cocaine, as opposed to some other substance, to Meyer.[4]

---

[4] We note that Turner previously raised a chain-of-custody argument, contending that the district court improperly admitted into evidence Government Exhibits 1 through 3 without testimony from Hanson as to how she handled the substances comprising those exhibits. In our prior decision,

(continued...)

We note further that despite Turner having opposed the admission of Block's testimony, his defense at trial in no way hinged on the notion that he distributed something other than crack cocaine to Meyer. Turner's trial counsel never explored this possibility during cross-examination of any government witness, including Block, nor did he make this suggestion in his opening statement or closing argument to the jury. Turner elicited no independent evidence that the substances could have been something other than crack cocaine. (Turner did not put on a defense case.) Turner's strategy instead was to question the veracity of Meyer's identification of

---

[4] (...continued)

we stated that the government is not obliged to present testimony from every witness who handled an exhibit before it may offer the exhibit into evidence. 591 F.3d at 935. Rather, the government need only show that it took appropriate precautions to preserve the evidence in its original condition; the district court otherwise grants the government the benefit of a presumption that the officials who had custody of an exhibit handled it appropriately. *Id.* (quoting *United States v. Prieto*, 549 F.3d 513, 524-25 (7th Cir. 2008)). Any gaps in the chain of custody established at trial in turn go to the weight of the evidence rather than its admissibility. *Id.* (quoting *Prieto*, 549 F.3d at 524-25). We pointed out that the substances Turner distributed to Meyer had remained in official custody at all times, such that the presumption of regularity applied; additionally, Hughes testified at trial that the substances appeared to be in the same condition as when he received them from Meyer. *Id.* The district court therefore committed no error in admitting these three exhibits. *Id.* We adhere to that conclusion here.

Turner as the individual from whom she had purchased crack cocaine, *see* R. 70 at 32-33, and to suggest, based on certain inconsistencies in the evidence, that the authorities had concocted the entire case against Turner after he was arrested on a warrant for outstanding child support payments and refused to cooperate with them by giving them information about a small quantity of marijuana found in his possession, R. 60 at 70-72, 74, 77-78. "This is a trumped up charge against a guy who didn't want to help after he got arrested on some child support warrant," Turner's counsel argued to the jury. R. 60 at 71. In short, the premise of the defense was that Turner did not distribute anything to Meyer, not that he distributed something other than crack cocaine.

Our point is not that Turner bore any burden with respect to the identity of the narcotics or somehow waived an argument that the evidence, apart from the problematic aspects of Block's testimony, was insufficient to show that the substances in question were crack cocaine. Turner, in fact, asked the district court to enter a directed judgment on the ground that the government had not proven the identity of the drugs in question. R. 60 at 58. Rather, our point is that, given the ample evidence otherwise indicating that what Turner distributed to Meyer was crack cocaine (and thus cocaine base), and given the focus of the defense case at trial, any Confrontation Clause error in allowing Block to testify (briefly) as to the process Hanson followed and the conclusion she reached in examining the substances was entirely harmless; it is clear that the jury would have

rendered the same verdict even if the harmless error had not occurred.

For all of these reasons, after careful consideration of the Supreme Court's decision in *Williams v. Illinois* and a fresh review of the trial record, we AFFIRM the judgment. We thank Turner's appointed attorneys for their vigorous and conscientious efforts on Turner's behalf.