In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-3484 & 07-3485

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS PRIETO and FERNANDO SANZ, a/k/a
Julio Castro-Cardenas, a/k/a Nicolas Cardenas,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 05 CR 139—**Philip P. Simon**, *Judge.*

ARGUED SEPTEMBER 4, 2008—DECIDED DECEMBER 2, 2008

Before MANION, WOOD, and TINDER, *Circuit Judges.*

MANION, *Circuit Judge.* After a traffic stop, officers found
over four kilograms of methamphetamine hidden in the
bumpers of the Honda Civic in which the defendants
Thomas Prieto and Fernando Sanz (collectively "the
appellants") were traveling. The appellants were both
charged with possessing with the intent to distribute
more than 500 grams of a substance containing metham-

phetamine in violation of 21 U.S.C. § 841(a)(1). After a three-day trial, a jury found Prieto and Sanz guilty. They appeal, alleging a variety of trial errors. We affirm.


I.

On August 26, 2005, Commander Oscar Martinez of the Lake County Police Department was about to finish his patrol for the day when he noticed the Honda Civic in which Prieto and Sanz were traveling veer on and off the highway's shoulder on I-65 south of the Crown Point, Indiana, exit. Martinez stopped the Civic. A video camera mounted inside Martinez's police cruiser captured the entire stop. In addition, a microphone in the police cruiser and another attached to Martinez captured the conversations between Martinez, Sanz, and Prieto during the stop. The government introduced the video and audio recordings from the stop at the appellants' trial.

After pulling the Civic over, Martinez approached the vehicle and asked Sanz, the driver, for his driver's license. Sanz, his hands shaking, handed Martinez his Mexican license. Sanz told Martinez that the Civic was registered to a "Nicolas Cardenas." Later investigation revealed that the car indeed was registered to "Nicolas Cardenas." Also revealed, however, was that Sanz had been arrested ten months earlier using the alias "Nicolas Cardenas"—the social security number listed on the title for the Civic matched the number Sanz had given at the booking after his prior arrest.

Martinez had Sanz step out of the Civic. Both Prieto and Sanz appeared extremely nervous. Martinez questioned

each of the men out of earshot of the other about the purpose of their trip. They gave conflicting accounts of the reason for their travel. Sanz told Martinez that they were traveling from Lafayette, Indiana, to Chicago for the day to visit friends and to look for a job. Prieto, on the other hand, told Martinez that they were going to Chicago for several days to visit family. Martinez issued Sanz a warning for unsafe lane movement and asked—in Spanish—for permission to search the vehicle, which Sanz granted. Martinez placed Prieto and Sanz in the rear of his police cruiser, returned to the Civic, and began searching the vehicle.

While Martinez searched the Civic, Prieto and Sanz discussed their responses to Martinez's queries about the purpose of their trip. The microphone inside Martinez's cruiser recorded that conversation[1]:

> PRIETO: I told him, "We're going to go see the family."
>
> SANZ:   What?
>
> PRIETO: That we're going to go see the family.
>
> SANZ:   Yeah. [SIGHS]

* * *

---

[1] Prieto and Sanz conversed in Spanish. The government provided a translation of their conversation in English for the jury at trial. The government also provided an English translation of Prieto and Sanz's jail phone conversation with Nuco, which we discuss later in this opinion.

SANZ:     Where did you tell him we were going?

PRIETO: To Chicago.

SANZ:     "We're going to Chicago to . . ."

PRIETO: "To go see family."

SANZ:     Huh?

PRIETO: "To go see some family."

SANZ:     Yeah uh, I told him we were going to go, go see some people because we were looking for a job.

PRIETO: Oh.

When Martinez's search took him towards the Civic's bumpers, Sanz and Prieto's conversation changed topics:

SANZ:     [SIGHS] Son of a bitch. Don't tell me he's headed towards the bumper. [SIGHS]

* * *

PRIETO: They went towards the bumper.

SANZ:     Huh?

PRIETO: They went towards the bumper.

SANZ:     [SIGHS]

PRIETO: They went towards the bumper?

SANZ:     Huh?

PRIETO: They went towards the bumper?

SANZ:     No, they can't see it.

Examining the front bumper, Martinez noticed two things indicative of a hidden compartment: fresh paint and "bondo," a type of plaster. Moving to the rear bumper, Martinez reached into the hollow part at the end of the bumper, felt plastic packaging, and pulled out a bag containing a white powder substance. Recognizing that the powder was narcotics, Martinez ordered both Prieto and Sanz at gunpoint to exit the police car and arrested them.

Handcuffed, and once again inside the police cruiser, the appellants lamented the turn of events:

> PRIETO: We're fucked.
>
> SANZ:     Now we're really fucked.
>
> PRIETO: Huh?
>
> SANZ:     Now we're screwed.

Their conversation continued:

> PRIETO: How are they going to know. Did they un-cover the front?
>
> SANZ:     Huh?
>
> PRIETO: Did they cover up the front?
>
> SANZ:     Yes.
>
> PRIETO: That's why.
>
> * * *
>
> PRIETO: We don't know anything.
>
> * * *

PRIETO: Did they get it out?

SANZ:    Huh?

PRIETO: Did they get it out?

SANZ:    No. [PAUSE] [SIGHS] You don't know, you don't know. Right?

PRIETO: Huh?

SANZ:    You don't know, you don't know.

PRIETO: Uh-huh.

SANZ:    [SIGHS] Supposedly the car's owner is out.

PRIETO: He's out and we don't know. They just let us borrow it.

The appellants continued to watch Martinez, who, along with another officer, had removed the rear bumper and the packages of narcotics contained therein and were turning their attention to the front bumper. As the officers began chiseling away at the front bumper, the appellants' discussion continued:

SANZ:    I never liked it [UNINTELLIGIBLE].

PRIETO: How was it?

SANZ:    It was fat, fat, fat and [UNINTELLIGIBLE] in the middle.

PRIETO: Oh.

PRIETO: What the fuck are they doing?

SANZ:    [CLEARS THROAT] They're going to rip the bumper in the middle.

PRIETO: Is there more in the middle?

\* \* \*

SANZ: Yes.

\* \* \*

PRIETO: [UNINTELLIGIBLE] We're fucked.

Unable to completely dismantle the front bumper on the roadside, the officers placed the front bumper in one of the officers' patrol car and took it to the police garage. The officers also transferred the defendants from Martinez's cruiser to the back of another patrol car and transported them to the police garage as well. At the police garage, Martinez and the other officers finished dismantling the front bumper and found several packages of narcotics inside.

While the officers were en route to the police garage, they informed Lake County Police Officer Lessie Smith (who was on assignment to a DEA task force) that they had stopped a car with drugs and were going to the police garage. Smith headed over to the garage. When she arrived, she saw Martinez in possession of the packages of narcotics, which were on the garage floor. After Martinez placed the packages on a vehicle lift where they were photographed, Smith and a police detective put the narcotics in a DEA evidence bag, drove them to her office, and placed them in the evidence room. DEA Agent David Ritchie assisted in packaging, processing, and sealing the narcotics for evidence. The drugs were placed in unique packages bearing Ritchie's name and handwriting.

Less than two weeks after their arrest, Prieto and Sanz made a joint telephone call from the Porter County jail to someone they identified as "Nuco." That conversation was recorded:

NUCO:   Hello?

PRIETO: What's up?

NUCO:   What's happening, man?

PRIETO: Nothing, man.

NUCO:   What . . . What's has [sic] been going on?

PRIETO: Nothing. We are here.

NUCO:   Where?

PRIETO: Here at the little school.

NUCO:   Oh!

PRIETO: Yeah.

\* \* \*

NUCO:   That guy wants . . . but exactly what it is, man. How the things are, how they went, and everything.

PRIETO: Uh-huh.

NUCO:   So . . . so in some way that . . . and what name you guys gave, man. Because you guys don't come up.

PRIETO: Well, look. Well, my name is Tomas Prieto.

NUCO:   Oh, yeah? And the other one?

PRIETO: Yeah. And Fernando Sanz. Fernando Sanz.

Nuco assured Prieto and Sanz not to think that "anyone is leaving you guys behind." He continued:

> NUCO: Hey, man, and but . . . and . . . what . . . how did it go down? More or less I mean . . .
>
> SANZ: No, no, no. It was a traffic stop. It was a ru. . . traffic stop. I mean, the lawyer told me that maybe it was for our appearances, you know what I mean?
>
> NUCO: Uh-huh.
>
> SANZ: Hispanic. That the . . . that the . . . [STUTTERS] police officer stopped us.
>
> NUCO: Uh-huh.
>
> SANZ: And um . . . and well . . . all of the . . . came out . . . he took out all of the shit.
>
> NUCO: But . . . did it go out straight or how . . . how?
>
> SANZ: Yeah. It went . . . it went more or less. Don't think that it went . . . but that supposedly this dude . . . is uh . . . he had experience in that shit. You know what I mean?
>
> NUCO: Mm-hmm.
>
> SANZ: And it left, well not . . . not exactly . . . it didn't go out full, but that . . . that . . . that apparatus that was in the front caught his attention.
>
> NUCO: Oh, yeah?
>
> SANZ: Yeah.

* * *

NUCO:     It's just that you guys didn't come up, so he wanted . . . the dude wanted to know exactly in what county and everything. Well, the one from here. Well the lawyer so that he . . . could go over there directly.

SANZ:     Yeah, yeah. No, no . . .

NUCO:     Because he was checking but because you guy[s] didn't come up. He said, "Well, I don't know why. Or ask them exactly if they gave another name."

SANZ:     It's just that man something happened that was similar to . . . to . . . [UNINTELLIGIBLE] those. You see that we . . . [STUTTERS] . . . how can I say it? They . . . uh . . . right away they passed us to the . . . well, to the federal department.

NUCO:     Let me see. Hold on. What did you say . . . did you give for your name?

SANZ:     My name is Fernando Sanz.

NUCO:     Hold on. [PAUSE] Fernando Sanz? Sanz?

SANZ:     Yeah. Yes.

NUCO:     Uh-huh. And the other one Tomas Prieto?

SANZ:     Tomas Prieto. [PAUSE] Tell him that on . . . on the twenty-sixth [26th] we are going to have the . . . the other court.

Before the conversation ended, Nuco again assured the appellants that "nobody is leaving you behind."

Both Prieto and Sanz were charged with one count of possessing with the intent to distribute more than 500 grams of a substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1). At trial, the government's first witness was Martinez. During the prosecutor's questioning of Martinez about the events leading up to the appellants' arrests, the following exchange occurred in which Martinez referenced the appellants' post-arrest silence:

> PROSECUTOR: And after they were handcuffed, what did you do with the Defendants or what did your fellow officers do with the Defendants?
>
> MARTINEZ: We put them back in my police car. They said nothing at all.

Neither of the appellants' attorneys objected. Later, the prosecutor played the video recording of the traffic stop for the jury on fast-forward and had Martinez narrate what was happening. Towards the end of that narration, Martinez stated that he told "Officer Musgrove to handcuff [Sanz]. And neither Mr. Sanz or Mr. Prieto said anything." This time, Sanz's attorney objected and moved for a mistrial. The court initially overruled the objection, but later, after a break in testimony and a chance to confer with the parties, struck the testimony from the record and gave this curative instruction to the jury:

> Officer Martinez testified on direct examination that the Defendants did not say anything when they were being placed under arrest. The Defendants have an

absolute right to remain silent. The fact that the Defen-
dants did not say anything may not be considered by
you in any way in arriving at your verdict. That
testimony is stricken from the record, and you
are admonished to disregard it.

After the court gave that instruction, no further mention
was made of the appellants' post-arrest silence.

Along with the transcripts of the conversations
between Prieto and Sanz in the back of Martinez's police
cruiser, the government also introduced into evidence
the transcript of the telephone call made to Nuco from
the Porter County jail. Prior to trial, the government had
filed a *Santiago* proffer (*see United States v. Santiago*, 582
F.2d 1128 (7th Cir. 1978)) announcing its intention to
introduce Nuco's statements under Federal Rule of Evi-
dence 801(d)(2)(E) as statements by a co-conspirator
made during the course of a conspiracy and in further-
ance of it. The court conditionally admitted Nuco's state-
ments subject to the *Santiago* requirements. When, during
trial, the government attempted to lay the foundation for
the introduction of the transcript of the jail telephone call
through Agent Ritchie, the prosecutor and Ritchie had the
following exchange:

> PROSECUTOR: Can you tell us in September of 2005,
> in connection with another investiga-
> tion that you had, what you did to
> further the investigation against
> these two defendants?
>
> RITCHIE: The investigation was furthered by
> obtaining the telephone calls that

were made from the jail, the Porter County jail.

* * *

PROSECUTOR: At the time in September of 2005, were you working on another investigation?

RITCHIE: Yes sir, I was.

PROSECUTOR: And what did that investigation—what about that investigation made you think that it would be useful to get telephone calls from the Porter County jail from these Defendants?

* * *

RITCHIE: The investigation that I was involved in at that time involved drug traffickers in Lafayette, Indiana whose source of supply was in Chicago. The fact that these individuals were stopped driving from Lafayette to Chicago with a large amount of methamphetamine made me believe there is a possible connection.

The attorneys for both Prieto and Sanz objected to this line of questioning and, after a bench conference, moved for a mistrial on the grounds that Ritchie's testimony violated Federal Rule of Evidence 404(b). The court denied that motion, stating:

I don't view this as 404-B evidence. Again, the reason
the question was asked is there was some reason that
this witness went to the Porter County jail to order up
the phone calls that we're about to hear, I am presum-
ing. So, the Government, it seems to me, wants to put
into context why he did that. Now, that's not 404 B. It's
not at all stating that these Defendants engaged in
some other act. In fact, as counsel says, they didn't do
those things. So, it's not another act under Rule 404-B.
And it is—if it were, it would be inextricably inter-
twined with this investigation.

So the objection is overruled. If you want me to give
some curative instruction to the jury that—along the
lines that that line of inquiry was only being offered to
place into context why the agent pulled the
phone calls, I'm glad to do that.

Sanz's attorney declined the court's offer for a curative
instruction, stating that he thought such an instruction
would "just draw[ ] more attention to it."

Ritchie also testified that the methamphetamine exhibits
the government presented were the same exhibits he
assisted in packaging as evidence on the day Prieto and
Sanz were arrested. He testified that he transported the
drugs from the evidence room to the DEA's laboratory in
Chicago for testing by a DEA chemist. During the testi-
mony of the DEA chemist, however, the appellants'
attorneys objected to the introduction of the methamphet-
amine exhibits, arguing that the government had failed
to show a proper chain of custody. The district court
denied the objection and ruled that, while the govern-

ment's presentation of evidence bearing on the chain of custody was "somewhat sloppy," a presumption of regularity applied because the drugs had not left police custody. It further held that any breaks in the chain of custody went to the weight of the evidence, rather than its admissibility.

At the conclusion of the government's case, the district court found that the appellants' statements during the jailhouse phone call were made in furtherance of the conspiracy and thus that the government had satisfied *Santiago*, making the statements admissible for all purposes. The court then entertained motions from the appellants' counsel, and counsel for the appellants moved for a judgment of acquittal based on the absence of a formal in-court identification of the appellants as the men Martinez arrested. The district court denied the motion and gave the following explanation:

> I was also surprised that there wasn't an in-court identification, frankly, of either Defendant. But anticipating that, in United States versus Weed[ ], 689 F.2d 752, it's a Seventh Circuit case from 1982, the Court said the following. Generally, an in-court identification of the accused is an essential element in the establishment of guilt beyond a reasonable doubt. However, identification can be inferred from all of the facts and circumstances that are in evidence.
>
> * * *
>
> Based on the evidence presented in this case, I am satisfied that the Government has established that the two gentlemen sitting in court here are . . . the same

gentlemen that were arrested at the scene of their arrest on I-65. That is linked up first and foremost by a videotape at the scene of both Mr. Prieto and Mr. Sanz, who appear the same as the two individuals sitting in court here today.

It's further tied up by the—as it relates to Mr. Sanz, the Mexican license that was handed over to Commander Martinez, and that photograph does meet the description of Mr. Sanz broadly.

In addition, I do agree that there were several occasions that I did notice and did see Commander Martinez when he was referring either to Mr. Prieto—both to Mr. Prieto and to Mr. Sanz, and interchangeably referring to them as the Defendants, him referencing and pointing to them here in open court.

Neither appellant testified or called any witness in his defense. The jury found both Prieto and Sanz guilty. The district court sentenced Prieto to 235 months' imprisonment and Sanz to 262 months' imprisonment. Both Prieto and Sanz appeal their convictions.


II.

The appellants first argue that Martinez's testimony about their post-arrest silence warranted a mistrial.[2]

---

[2] Because the district court later struck Martinez's testimony, Sanz's argument that the district court abused its discretion in admitting Martinez's testimony is moot. However, we do

(continued...)

"[B]ecause the trial court 'is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial,' we review the court's denial of a motion for mistrial for an abuse of discretion*." United States v. Curry*, 538 F.3d 718, 726-27 (7th Cir. 2008) (quoting *United States v. Danford*, 435 F.3d 682, 686 (7th Cir. 2006)). "We will reverse a district court's denial of a mistrial only if we have a strong conviction that the district court erred. The ultimate inquiry is whether the defendant was deprived of a fair trial." *Danford*, 435 F.3d at 686 (internal quotation marks and citation omitted).

"[T]he Fifth Amendment, in its direct application to the Federal Government . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *United States v. Jumper*, 497 F.3d 699, 704 (7th Cir. 2007) (quoting *Griffin v. California*, 380 U.S. 609, 615 (1965)). In support of their contention that they should be granted a mistrial, the appellants invoke the Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610 (1976). The question in *Doyle* was whether a prosecutor can impeach a defendant on the stand with his post-arrest silence; the Supreme Court answered in the negative. 426 U.S. at 611. Neither Prieto nor Sanz explains how *Doyle* applies here, where neither of the appellants testified, the references to the

---

[2] (...continued)

consider whether the jury's hearing of this evidence justified a mistrial.

appellants' post-arrest silence arose in the context of a witness's stray remarks during the narrative portions of his testimony, and the prosecutor neither intentionally elicited the testimony nor argued any adverse inferences to the jury from the silence. *Compare Jumper*, 497 F.3d at 706-07 (finding harmless error where district court admitted portions of a video-taped interrogation during which the defendant invoked his right to remain silent), *with Lindgren v. Lane*, 925 F.2d 198, 200-01 (7th Cir. 1991) (finding witness's reference to the defendant's silence, without evidence that the prosecutor used or was permitted to use that testimony, did not violate the Fifth and Fourteenth Amendments).

We need not dwell on the appellants' failure to address the applicability of *Doyle*. Even assuming Martinez's statements violated the appellants' Fifth Amendment rights, any error resulting from the jury hearing that testimony was undoubtedly harmless. Recall that Martinez only mentioned the defendants' post-arrest silence twice. The first time Martinez remarked "they said nothing at all" in response to the prosecutor's question about what Martinez did with the defendants after handcuffing them. The second time Martinez stated "neither Mr. Sanz or Mr. Prieto said anything" towards the end of his narration of the video recording of the traffic stop. The district court struck both of those statements from the record and admonished the jury to disregard them. *See United States v. Robbins*, 197 F.3d 829, 836 (7th Cir. 1999) ("Errors that are the subject of curative instructions are presumed harmless."). The references themselves were short and not intentionally elicited by the prosecutor. The

prosecutor did not highlight the appellants' silence by asking Martinez any follow-up questions, and he did not broach the subject with any other witness or at closing argument. *See Jumper*, 497 F.3d at 707.

In addition, the evidence of Prieto's and Sanz's guilt was overwhelming. The Civic in which the appellants were traveling contained a massive quantity of hidden methamphetamine. The car was registered to "Nicolas Cardenas," an alias that Sanz had previously used. The appellants were nervous and gave conflicting stories about their travels. And the appellants' conversations both in the back of Martinez's patrol car and with Nuco speak for themselves, plainly exposing their guilt. In light of that clear evidence of the appellants' guilt, we can confidently say that the temporary admission of Martinez's statements about the appellants' silence was harmless beyond a reasonable doubt. *See id.* at 706 ("An error is harmless if it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (quoting *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1052 (7th Cir. 2005))).

Next, the appellants make two challenges to the district court's denial of their motion for a mistrial based on Agent Ritchie's statements about the possible connection between the appellants and another drug investigation. They first argue that Ritchie's statements were inadmissible propensity evidence and should have been excluded under Federal Rule of Evidence 404(b). In the alternative, Sanz contends that the statements should have been excluded under Federal Rule of Evidence 403

because the probative value of the proffered evidence was substantially outweighed by the danger of unfair prejudice.[3] In response, the government argues that Rule 404(b) was not implicated because Ritchie only spoke of a "possible connection" and did not state that the appellants had in fact engaged in other illegal drug activity. The government also asserts that the testimony was "inextricably intertwined" with this case and necessary to explain why Ritchie retrieved the recordings of the appellants' phone calls from the Porter County jail.

Ritchie's testimony linking the appellants to another drug investigation was not necessary to provide context for his interception of the phone calls. The prosecutor could have given the jury all the context it needed simply by eliciting testimony from Ritchie that the telephone conversations of prisoners are routinely recorded and that federal agents routinely (or occasionally) listen to those conversations in preparation for trial. Providing context in that way would have avoided the possibility of any prejudice arising from connecting the appellants to another drug investigation. Instead, the prosecutor chose a more problematic route.

That being said, any error that may have arisen from the admission of this testimony was harmless.[4] Ritchie only

---

[3] We note that Sanz did not present this Rule 403 argument to the district court, so we review it for plain error only. *United States v. Sloan*, 492 F.3d 884, 895 (7th Cir. 2007).

[4] Because we conclude that any error would be harmless, we need not rule on whether the district court abused its discre-

(continued...)

spoke of a *possible* connection to the other investigation and his testimony on the subject was brief. Again, the evidence against the appellants was overwhelming. Thus, the admission of Ritchie's statements did not affect the outcome of the trial, and the district court's decision denying the appellants' motion for a mistrial need not be reversed. *See United States v. Ratliff-White*, 493 F.3d 812, 826 (7th Cir. 2007) ("Errors do not merit reversal when the government proves that they are harmless, that is, that they did not affect the outcome of the trial." (quoting *United States v. Ortiz*, 474 F.3d 976, 982 (7th Cir. 2007))).

For the appellants' next contention of error, Sanz questions the district court's ruling that Nuco's statements during the jail phone conversation were admissible pursuant to Federal Rule of Evidence 801(d)(2)(E). We review a district court's ruling on the admissibility of evidence for an abuse of discretion. *United States v. Jackson*, 540 F.3d 578, 587 (7th Cir. 2008). "In order for a statement made by a member of a conspiracy to be admissible against other members of the conspiracy under Rule 801(d)(2)(E), the government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy." *United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008).

Sanz contends that there was not enough evidence to establish by a preponderance that Nuco, Prieto, and Sanz

---

[4] (...continued)
tion in admitting Ritchie's testimony.

were involved in an existing conspiracy and that Nuco's statements[5] were made during the course and in furtherance of that conspiracy. On the contrary, the record is replete with evidence that Nuco, Prieto, and Sanz conspired to transport narcotics and that the jailhouse phone conversation between those three was in furtherance of that conspiracy. Although not charged, the evidence supports a finding of a conspiracy between Prieto and Sanz to transport methamphetamine for distribution. *See United States v. Moon*, 512 F.3d 359, 363 (7th Cir. 2008) (observing that a prosecutor need not charge a conspiracy to take advantage of Rule 801(d)(2)(E)). Furthermore, the subject matter and tenor of the jailhouse conversation indicate that Nuco participated in the conspiracy and that the purpose of the call was to further the conspiracy—in particular, for Prieto and Sanz to report their status to Nuco and, in turn, receive assurances of assistance from their co-conspirators. *Cf. United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987) (finding that a conversation reporting on the conspiracy's progress was in furtherance of the conspiracy); *United States v. Buishas*, 791 F.2d 1310, 1315 (7th Cir. 1986) (finding assurances given by a co-conspirator that he could be trusted to perform his role admissible as statements in furtherance of the conspiracy). At the beginning of the conversation, the appellants apprised Nuco of their status. That Nuco appeared familiar with Prieto and Sanz ("What's happening, man?" "What's . . . been going on?") yet did not

---

[5] Sanz does not challenge the admission of Prieto's statements during the phone conversation against him.

know what "name you guys gave" is telling, as it suggests that the members of the conspiracy were using aliases to protect the conspiracy. Nuco then requested the details of their capture—information that would be of great value to any continuing efforts to smuggle narcotics through northern Indiana. Near the end of the conversation, Nuco gave repeated assurances to the appellants that no one was leaving them behind. Those assurances demonstrated that the conspiracy was ongoing, since they reasonably implied that the other members of the conspiracy would take care of Prieto and Sanz if they did their part and did not divulge any information to the authorities. From that evidence, the district court was well within its discretion to conclude that Nuco's statements were made in furtherance of an ongoing conspiracy, and we will not disturb its ruling.

The appellants also challenge the chain of custody of the government's methamphetamine exhibits. We review for an abuse of discretion the district court's evidentiary rulings on the chain of custody for physical exhibits. *United States v. Lee*, 502 F.3d 691, 697 (7th Cir. 2007). "The standard for the admission of exhibits into evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as when the crime was committed." *Id*. (quoting *United States v. Moore*, 425 F.3d 1061, 1071 (7th Cir. 2005)). "In making this determination, the district court makes a 'presumption of regularity,' presuming that the government officials who had custody of the exhibits discharged their duties properly." *United States v. Scott*, 19 F.3d 1238, 1245 (7th Cir. 1994). The chain of custody need not be perfect; gaps in the chain go to the weight of the

evidence, not its admissibility. *Lee*, 502 F.3d at 697. In addition, the government does not have to exclude all possibilities of tampering with the evidence. Instead, the government need only show that "it took reasonable precautions to preserve the original condition of the evidence." *Id*. (quoting *United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988)).

The district court's decision to admit the methamphetamine exhibits was not an abuse of discretion. True, as the district court pointed out, the government could have done a better job establishing exactly what happened to the packages of drugs before they ended up on the floor of the police garage. For instance, the government did not offer any testimony about what happened to the drug packages removed from the rear bumper from the time they were removed to the time they appeared on the floor of the police garage. Nevertheless, the district court did not err in admitting the exhibits because such minor gaps in the chain go to the weight of the methamphetamine exhibits rather than their admissibility. Moreover, because no evidence in the record indicated that the narcotics ever left police custody, the presumption of regularity therefore applies. Although the appellants argue against the presumption on the grounds that two reporters and a tow-truck driver were in the vicinity with the officers at the time of their arrest, the appellants have not pointed to any evidence of tampering. As we have said before, "[m]erely raising the possibility of tampering is not sufficient to render evidence inadmissible; the *possibility* of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility." *United States v. Kelly*, 14 F.3d 1169, 1175

(7th Cir. 1994). The district court therefore did not err when it admitted the methamphetamine exhibits into evidence and allowed the jury to determine what weight that evidence deserved.

Lastly, the appellants contend that the district court should have granted their motion for acquittal because the government failed to elicit an in-court identification of the appellants. In denying the appellants' motion, the district court cited *United States v. Weed*, 689 F.2d 752 (7th Cir. 1982). We held in *Weed* that the lack of an in-court identification of the defendant did not require a judgment of acquittal. Although recognizing that an in-court identification of the accused is generally required to establish guilt beyond a reasonable doubt, we observed that identification can also "be inferred from all the facts and circumstances that are in evidence." *Weed*, 689 F.2d at 754. We found from the following facts and circumstances in *Weed* that the identification of the defendant could be inferred:

> In this case, three Customs agents testified regarding the events of the evening of December 22, 1977 and the statements made by Weed. None of these witnesses during the bench trial noted that the defendant was not the same John Weed stopped in 1977. Both the prosecution and defense counsel referred to the defendant at trial as the John Weed involved in the December, 1977 events. At no time did defense counsel object to the prosecution's references to "the defendant." Appellate counsel, who was also defense counsel, admitted at oral argument to this

Court that he realized no identification had been made during the testimony of the third witness, yet he still did not object to references to the defendant.

*Id.* at 755-56.

As in *Weed*, the identification of Prieto and Sanz could be inferred from all the facts and circumstances in evidence. Commander Martinez repeatedly referred to Prieto and Sanz by name during his testimony and, as the district court noted, repeatedly pointed to them when he referred to them in open court as the men he arrested. In addition, the jury could compare Prieto and Sanz to the men in the video of the traffic stop that was played twice during trial and identify them that way. Thus, the government's failure to explicitly elicit an in-court identification of Prieto and Sanz was not fatal to the government's case, and the district court did not err in denying the appellants' motion for a judgment of acquittal on that basis.

### III.

The evidence against the appellants was overwhelming. Thus, the district court did not err in briefly admitting Martinez's stray comments about the appellants' post-arrest silence. Nor, for the same reason, did it err in admitting Agent Ritchie's statement about Prieto and Sanz's possible connection to another drug investigation. The district court also did not abuse its discretion by admitting Nuco's statements from the jail telephone conversation because the evidence supported the court's

finding that the call was in furtherance of a conspiracy involving Nuco and the appellants. In addition, the district court did not abuse its discretion in admitting the methamphetamine exhibits because any minor break in the chain of custody went to the weight of the exhibits rather than their admissibility. Finally, since the jury could have inferred the identification of Prieto and Sanz from all the facts and circumstances in evidence, the appellants were not entitled to a mistrial due to the lack of a formal in-court identification. We AFFIRM.