In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3109

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DANNY TURNER,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:08-cr-22-bbc—**Barbara B. Crabb**, *Chief Judge*.

ARGUED MAY 14, 2009—DECIDED JANUARY 12, 2010

Before ROVNER and EVANS, *Circuit Judges*, and
VAN BOKKELEN, *District Judge*.[*]

VAN BOKKELEN, *District Judge*. Danny Turner was
convicted by a jury of three counts of dealing crack

---

[*] The Honorable Joseph S. Van Bokkelen, United States District
Court Judge for the Northern District of Indiana, sitting
by designation.

The panel thanks Hari Santhanam of Kirkland & Ellis for
representing Danny Turner on the appeal in this case.

cocaine. The district court sentenced him to 210 months of imprisonment on each count, to be served concurrently. Turner appeals, arguing that the district court should not have allowed a chemist to testify at trial about the nature of the drug exhibits because the chemist did not himself test those exhibits. Turner also believes that the district court should not have admitted the drugs into evidence because the government did not establish a proper chain of custody. We conclude that the district court was correct in both instances, and we affirm its judgment.

## I. Background

In early 2008, Dane County Narcotics and Gang Task Force officers learned that Danny Turner was selling crack cocaine in Madison, Wisconsin. On January 17, 2008, undercover officer Kim Meyer purchased crack cocaine from Turner, and again on January 25 and February 12. After the February 12 purchase, officers arrested Turner. A week later, a federal grand jury in the Western District of Wisconsin indicted Turner on three counts of distributing cocaine base (crack cocaine), in violation of 21 U.S.C. § 841(a)(1).

At the pretrial motion hearing, the district court set a May 5, 2008, deadline for government's disclosure of expert witnesses. On May 1, the government notified Turner that it intended to call as an expert witness Amanda Hanson, an analyst at the Wisconsin State Crime Laboratory, regarding the weight and identification of the drugs alleged in the Indictment. Hanson was the chemist who analyzed the substances the undercover

agent purchased from Turner. On May 8, however, the government advised Turner that it would instead be calling a different expert witness—Hanson's supervisor, Robert Block—because Hanson was on maternity leave. Block is a senior forensic chemist and head of the drug identification unit at the crime laboratory in Madison.

On May 12, Turner moved in limine to exclude Block's expert testimony. Turner argued that Block's testimony, in lieu of Hanson's testimony, would violate the Confrontation Clause of the Sixth Amendment to the United States Constitution. The government objected to the motion and, in turn, assured the district court that Block would testify about his own conclusions, not Hanson's, about the nature of the substances she tested. The district court denied Turner's motion.

At trial, the government called Block as its expert witness to identify the substances the undercover officer bought from Turner. Among other things, Block testified about the crime lab's procedures for processing and testing the evidence. Block described the safeguards used by the lab to prevent the commingling and tampering of evidence. He testified that the instruments at the lab are calibrated each day that they are used and that blank samples are run between each test to avoid contamination or carryover from previous testing.

Block also explained how suspected substances are tested through gas chromatography, mass spectrometry, and infrared spectroscopy to generate graph data in order to determine the type of drug involved:

> The gas chromatography will print out a set of peaks that would be indicative of the presence of a drug or

a standard that is run on that instrument for comparison purposes. The mass spectrometer will print out a spectrum for a drug that has been extracted. This is a specific test. By specific, it means the results that are generated are unique to that drug and no others. Likewise the spectrum that is produced in the infrared spectroscopy will generate a spectrum, and again, this is the second specific test, the results of which are specific to each and every individual drug.

(Def.'s Appendix at 26.)

In addition, Block described how each chemist's analysis must undergo a peer review, and that, as the unit head, he peer-reviewed Hanson's tests in this case:

Prior to the report leaving the laboratory, every report must undergo a peer review by another qualified analyst within the unit. As the unit head, I perform the peer review of the other analysts within the drug identification section. I reviewed this report that Amanda Hanson generated for the analysis of the chunky material in Exhibits 1, 2, and 3, reviewing the handwritten notes and the generated data, and came to the same conclusion based on the information provided that each of these items contained the same material and I signed off on that peer review.

(Def.'s Appendix at 22.)

Ultimately, Block testified that the substances tested by Hanson—introduced at trial as Exhibits 1, 2, and 3—contained cocaine base:

Q. So are you able—were you able to form an opinion as to the nature of the substance in those three exhibits?

A. Yes, I was.

Q. And what's your opinion?

A. My opinion based upon the examinations that were performed on the chunky materials within Exhibits 1, 2, and 3, along with my experience, is that each of these items in 1, 2, and 3 contain cocaine base.

(*Id*.)

Neither Hanson's lab report, nor her notes, nor the data charts were introduced into evidence.

At the close of the government's case, Turner moved for a directed verdict. He argued that the government had not established a sufficient chain of custody to prove that the drugs tested were the same substances the undercover agent purchased from him. The district court denied Turner's motion.

Turner chose not to present any evidence. After closing arguments, the jury returned guilty verdicts on all three counts of the indictment. The district court sentenced Turner as a career offender to 210 months of imprisonment on each count of the Indictment, to be served concurrently.

## II. Analysis

### A. *Issues for Appeal*

Turner's appeal raises two issues:

1.  Whether the district court violated his Sixth Amendment right to confront Hanson, the forensic chemist who tested the drugs; and

2.  Whether the district court abused its discretion by admitting the drugs into evidence without Hanson's testimony as to how she handled the drugs during the testing.

### B. *The Sixth Amendment*

Turner argues that the district court violated his Sixth Amendment right to confrontation by permitting Block to testify about Hanson's tests. Turner claims that Hanson's notes, machine test results, and her final report were testimonial in nature and that Block's reliance of these materials violated his right to confront a witness because the government had not demonstrated that Hanson was unavailable for trial. Turner insists that our decision in *United States v. Moon*, 512 F.3d 359 (7th Cir. 2008), mandates that his conviction be vacated.

"We review evidentiary rulings implicating a defendant's Sixth Amendment right to confrontation de novo." *United States v. Burgos*, 539 F.3d 641, 643 (7th Cir. 2008). If any error is to be found, "an otherwise-valid conviction should not be set aside if the constitutional error was harmless beyond a reasonable doubt." *Id.* (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. Accordingly, the government may not introduce into evidence "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *United States v. Crawford*, 541 U.S. 36, 53-54 (2004). "The critical inquiry is whether the statements in question are 'testimonial'—because, as the [Supreme] Court held, it is only that type of statement that makes a declarant a 'witness' under the Confrontation Clause." *Burgos*, 539 F.3d 641, 643 (7th Cir. 2008) (quoting *Crawford*, 541 U.S. at 51).

Therefore, we must first determine if the government introduced any statements from Hanson that were testimonial, without first demonstrating that she was unavailable for trial and without giving Turner an opportunity to cross-examine her. No such problem exists. With the exception of Block's passing comment—which we address below—that having peer-reviewed Hanson's analysis, he reached the same conclusion as Hanson about the nature of the exhibits; nothing from Hanson's notes, machine test results, or her final report was introduced into evidence. Accordingly, we are faced with a similar situation as in *Moon* where the government's expert witness was properly allowed to rely on the information gathered and produced by a lab employee who did not testify at trial.

In *Moon*, a DEA chemist testified at trial that the substance seized from the defendant was cocaine. The

chemist did not perform the tests himself. Instead, the lab work had been done by another employee who left the agency three weeks before trial. The chemist based his testimony on the output of an infrared spectrometer and a gas chromatograph as well as the employee's report and lab notes. In addition, the government entered into evidence, without an objection, the employee's report, which contained both the readings taken from the instruments and his own conclusion that those readings meant the tested substance was cocaine. *Moon*, 512 F.3d at 362. On appeal, the defendant challenged the district court's admission of the employee's report.

We found that there was no problem with the chemist's testimony because

[h]e testified as an expert, not as a fact witness. When the expert testifies, "the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Fed. R. Evid. 703. So if the Confrontation Clause precludes admitting [the employee's] report, this does not spoil [the chemist's] testimony.

*Id*. at 361. We also held that instrument readouts were not "statements" and, thus, could not be testimonial. *Id*. at 362.

Likewise, we see no problem with Block's expert testimony, especially in light of the fact that Hanson's summaries, which contained some testimonial statements, were not admitted into evidence. Turner's contention that Block could not rely on Hanson's work product has no support in law: "the Sixth Amendment does not de-

mand that a chemist or other testifying expert have done the lab work himself." *Id*.

Turner further argues that the district court violated his rights under the Sixth Amendment confrontation clause when it allowed Block to testify that his conclusions about Exhibits 1, 2, and 3 were the same as Hanson's. Turner points to language in *Moon* that, while the expert was entitled to analyze the data gathered by the lab employee who tested the drugs, the employee's "own conclusions based on the data should have been kept out of evidence (as doubtless they would have been, had defendant objected)." *Id*.

But in this regard *Moon* is different from Turner's case. The expert witness in *Moon* was not involved in the testing process of the suspected substances: he was strictly an expert witness. Block, on the other hand, was the laboratory supervisor whose job was to personally check Hanson's test results. As such, he could testify about his personal involvement in the testing process, about the accuracy of the tests, and about agreeing with Hanson when he signed off on her report. What is more, Block's testimony unequivocally establishes that his opinion about Exhibits 1, 2, and 3 was his own:

> Q. So are you able—were you able to form an opinion as to the nature of the substance in those three exhibits?
>
> A. I was.
>
> Q. My opinion based upon the examinations that were performed on the chunky materials within

> Exhibits 1, 2, and 3, along with my experience, is that each of these items in 1, 2, and 3 contain cocaine base.

(Def.'s Appendix at 22.)

Yet, even if it had been an error for Block to describe how the peer review process applied in this case, the error would have been harmless under any standard. Block's statement was a passing reference to Hanson in the context of explaining the procedures for processing and testing the evidence at the laboratory. This was not a case of trying to introduce Hanson's opinion through the back door or to bolster her conclusion in order to make Block's own opinion more believable. Therefore, Turner's reliance on *United States v. Cuong*, 18 F.3d 1132 (4th Cir. 1994), is misplaced.

In *Cuong*, the defendant, a doctor, was charged with illegally prescribing painkillers. The government called an expert witness to testify about the defendant's practice of prescribing the drugs. The expert testified that in his opinion the drugs were medically unnecessary and that his findings "were essentially the same" as the findings of his close friend, Dr. Stevenson, who "is also a lawyer, and . . . is well thought of in Northern Virginia," and who "has been president of Medical Society." *Id*. at 1143. The defendant objected to the expert's testimony about Dr. Stevenson but the judge let it in.

The Fourth Circuit reversed the district court because "the defendant [was] subjected to the testimony of a witness whom he may not cross-examine, and [the expert witness] bolstered his testimony by claiming that an

outstanding doctor, who is also a lawyer and president of the Medical Society, agrees with him." *Id*.

Unlike in *Cuong*, the qualifications of Hanson—the testing scientist—were not put before the jury. And the brief mention of her conclusion was made in reference to explaining how the peer review process works at the laboratory:

> Prior to the report leaving the laboratory, every report must undergo a peer review by another qualified analyst within the unit. As the unit head, I perform the peer review of the other analysts within the drug identification section. I reviewed this report that Amanda Hanson generated for the analysis of the chunky material in Exhibits 1, 2, and 3, reviewing the handwritten notes and the generated data, and came to the same conclusion based on the information provided that each of these items contained the same material and I signed off on that peer review.

(Def.'s Appendix at 22.)

Accordingly, we find that, even if it was an error for the district court to allow Block to state that his opinion was the same as Hanson's, the error was harmless.

After the oral argument in this case, the Supreme Court of the United States decided *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527 (2009). In *Melendez-Diaz*, the prosecution introduced certificates of analysis as a substitute for in-court testimony to show that the substance recovered from the defendant was cocaine. "The certificates were sworn to before a notary public by analysts at the State

Laboratory Institute of the Massachusetts Department of Public Health." *Id*. at 2531. The Supreme Court held that the certificates were testimonial statements and the prosecution could not prove its case without first showing that a witness was unavailable and that the defendant had had an opportunity to cross-examine him.

Turner submitted a supplemental brief, claiming that *Melendez-Diaz* stands for the proposition that he should have been able to confront Hanson on the witness stand. Turner's argument is faulty. In writing for the Court, Justice Scalia explicitly stated that "we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." *Id*. at 2532 n.1. Moreover, *Melendez-Diaz* did not do away with Federal Rule of Evidence 703. And most importantly, unlike in *Melendez-Diaz*, Hanson's report was not admitted into evidence, let alone presented to the jury in the form of a sworn affidavit, "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,'" *id.* at 2532. Instead, Block testified as an expert witness presenting his own conclusions about the substances in question to the jury. Accordingly, *Melendez-Diaz* does not control this case.

## C. *Chain of Custody*

Turner argues that the district court abused its discretion in admitting Exhibits 1, 2, and 3 into evidence

even though the government did not present any witness who had personal knowledge of Hanson's handling and testing of the substances the undercover officer bought from him. He contends that nothing is known about how Hanson handled the drugs, whether she followed appropriate procedures or tampered with the evidence. Turner thus argues that there is a gaping hole in the chain of custody which makes the evidence inherently unreliable and requires that his conviction be vacated. Turner suggests that the presumption of regularity does not apply in testing suspected substances because the job of a laboratory chemist is "exceptionally complex and often prone to error, bias, and prejudice." (Appellant's Br. at 33.)

We review the district court's evidentiary rulings, including matters concerning chain of custody for physical exhibits, under the abuse of discretion standard. *United States v. Prieto*, 549 F.3d 513, 524 (7th Cir. 2008). We will not reverse a trial judge unless the record contains no evidence on which the trial court could have rationally based its decision. *United States v. Tatum*, 548 F.3d 584, 587 (7th Cir. 2008).

As we have stated before, the government is not required to call every witness who handled an exhibit before that exhibit may be admitted into evidence:

> The standard for the admission of exhibits into evidence is that there must be a showing that the physical exhibit being offered is in substantially the same condition as when the crime was committed. In making this determination, the district court makes a

"presumption of regularity," presuming that the government officials who had custody of the exhibits discharged their duties properly." The chain of custody need not be perfect; gaps in the chain go to the weight of the evidence, not its admissibility. In addition, the government does not have to exclude all possibilities of tampering with the evidence. Instead, the government need only show that it took reasonable precautions to preserve the original condition of the evidence.

*United States v. Prieto*, 549 F.3d 513, 524-25 (7th Cir. 2008) (citations and quotation marks omitted).

Because the substances purchased from Turner remained in official custody at all times, the presumption of regularity applies. Turner presents no case law to the contrary, and we find no compelling reason to do away with this principle in the context of laboratory testing. Turner only speculates that Hanson might have tampered with the evidence, but speculation is not enough to reverse the district court's evidentiary ruling. Moreover, Detective Hughes testified at trial that the drugs appeared to be in substantially the same condition as when he received them from Officer Meyer. Finding no error in the district court's decision to allow Exhibits 1, 2, and 3 into evidence, we decline Turner's request to vacate his conviction.

### III. Conclusion

Because we find that the district court did not commit error in allowing Block's testimony at Turner's trial and

did not abuse its discretion in admitting into evidence Exhibits 1, 2, and 3, we affirm the judgment of the district court.

AFFIRMED.