In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-1646

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ZEBULON XAVIER MARZETTE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:21-cr-00005-DRL-MGG-1 — **Damon R. Leichty**, *Judge.*

_____

ARGUED FEBRUARY 23, 2024 — DECIDED JULY 1, 2024

_____

Before SCUDDER, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Zebulon Marzette appeals his conviction for possessing a firearm as a felon, challenging the district court's admission of two pieces of evidence at trial. Marzette preserved one of his challenges—a chain-of-custody challenge to DNA evidence—but not the other—a hearsay challenge to police testimony about the content of a 911 call. In the end, the government's chain-of-custody evidence

sufficed and, under the demanding standards of plain error review, Marzette fails to persuade us that any error allowing the 911 caller's statements to come in through police testimony prejudiced him at trial. So we affirm.

**I**

A

The trial record supplies the operative facts.

At about 5:30 p.m. on September 20, 2019, a 911 dispatcher received a call reporting an incident at the LaSalle Park Homes apartment complex on Falcon Street in South Bend, Indiana. The caller stated that there were people pounding on her door and waving guns. The dispatcher relayed the information to four officers—Sergeant Miranda Baker, Officer Bryan Watkins, Officer Chris Butler, and Officer Joshua Lawson. Sergeant Baker and Officer Watkins responded directly to the apartment complex to investigate the disturbance, while Officers Butler and Lawson checked out the perimeter.

The responding officers encountered a dynamic environment, complicated by the simultaneous occurrence of several events. Sergeant Baker and Officer Watkins arrived at the complex looking for armed suspects. The officers described the scene as "chaotic," with several people outside yelling at them that "the people with guns" ran down an alleyway leading towards the backside of the building. After first ensuring no one in front of the building was armed, Sergeant Baker then headed for the alleyway in search of the people who caused the reported disturbance.

As Sergeant Baker swept the complex's surroundings, two other events unfolded in parallel. Officers Butler and Lawson—who drove directly to the perimeter of the complex—

pulled over (for reasons unclear from the trial record) a Blue Chevy Malibu that they saw driving away from the backside of the building. Around the same time, Zebulon Marzette left the apartment complex on foot and walked to the location of the car stop. What happened next is unclear. At some point, the officers handcuffed Marzette and placed him in the back of the squad car. We cannot tell what prompted that action. We are not required to answer this question, however, because Marzette does not challenge any aspect of his detention on appeal.

Later—whether before or after detaining Marzette we cannot say—Officers Butler and Lawson radioed for assistance. This led Sergeant Baker and Officer Watkins to head in the direction of the car stop. By the time they arrived, the Malibu had been stopped, its passenger-side door was open, and one passenger stood outside of the car while the driver remained inside. According to Officer Watkins, a third person—Marzette—was handcuffed in the back of Officer Lawson's car.

In the course of these events, Marzette asked to speak with Sergeant Baker and proceeded to tell her that his sister had called him to the LaSalle Park complex because "people were at her apartment waving guns." He stated that he had come to her apartment to help his sister.

While Marzette was talking to Sergeant Baker, Officer Watkins was gathering information from the Malibu's occupants. The driver did not have any identification on her, and initially gave Officer Watkins a fake name and birth date. Through continued questioning Officer Watkins eventually learned that she was Shawnta Rector, Marzette's girlfriend. During the course of these interactions, Officer Watkins noticed through the open passenger door a softball-sized bag of

a "green leafy substance" next to the passenger seat. This led Officer Watkins to arrest Rector.

As Rector was being handcuffed, the passenger standing outside of the Malibu directed Officer Watkins's attention to a gun in a green purse resting on the back seat of the car. Upon looking inside, Officer Watkins immediately saw the gun sitting on the top of the purse as if someone had "recently placed" it there. The passenger insisted that the purse belonged to Rector. Rector then confirmed that the purse was hers and claimed ownership of the gun as well.

As Officer Watkins spoke with Rector, Sergeant Baker questioned Marzette. Marzette was within earshot of Officer Watkins and Rector and frequently diverted his attention away from Sergeant Baker to Rector's conversation with Officer Watkins. Marzette urged Sergeant Baker not to tow the Malibu. He explained that he wanted to drive the car away because his brother had rented it from Hertz and listed Marzette's name on the rental agreement. During this exchange about the Malibu, Marzette apparently saw the gun in the back seat of the Malibu. He then told Sergeant Baker that he was a felon and that "he did not touch the gun so his DNA would not be on it." Marzette does not challenge the admission of these statements on appeal.

Marzette's statement proved inaccurate. The officers seized the gun and had it tested for DNA evidence. The analysis revealed the presence of Marzette's DNA on the trigger. A federal indictment followed, charging Marzette with one count of felony possession of a firearm on or about September 20, 2019, in violation of 18 U.S.C. § 922(g)(1). In time the case proceeded to a jury trial.

B

The trial was all about whether Marzette possessed the gun found in the backseat of the Malibu on September 20, 2019. Over no objection from Marzette, the government's first two witnesses described the 911 dispatch call to the apartment complex, telling the jury that they responded to a report of "people pounding at [the caller's door] waving guns." The four officers went on to explain how they handled the traffic stop, painting a clear picture of the facts already described.

With that background in place, the government then turned to forensic evidence to show that Marzette possessed the gun at some point prior to the police recovering it from the Malibu. A forensic DNA analyst testified that the DNA of three people was found on the gun and that it was highly likely that Rector and Marzette were two of those people. He opined that it was at least one trillion times more likely that the DNA originated from Marzette, Rector, and an unidentified third person than from three random strangers. Even more specifically, the analyst stated that 54% of the DNA on the trigger belonged to Marzette, suggesting that he had touched the gun the most or at least most recently.

Several witnesses testified to the chain of custody the gun followed from the traffic stop to the forensic laboratory. Marzette objected to the introduction of this DNA-related evidence, arguing that each custodian in the gun's chain of custody needed to come to open court and testify to prove that the gun and the DNA evidence were authentic and reliable. The district court disagreed and overruled Marzette's objection, admitting the DNA-related testimony and testing results into evidence upon finding that the government laid the proper foundation for its admission.

In its closing argument, the government urged the jury to find that the evidence proved Marzette's constructive possession of the firearm on September 20, 2019 beyond a reasonable doubt. The government contended that the evidence lent itself to the straightforward conclusions about what happened that afternoon: the same day the officers received a dispatch call of "people pounding at [the caller's door] waving guns," Marzette drove the Malibu to his sister's apartment with the gun in the car and tried to protect her from the violent altercation. Then, when he heard the officers coming, he left the gun in the car and told his girlfriend to drive away. But once he noticed that she was being pulled over, Marzette panicked, walked to the traffic stop, and made statements to Sergeant Baker connecting himself to the disturbance at the apartment and the gun found in the Malibu's backseat. In short, Marzette "injected" himself into the center of the investigation.

Marzette pressed a different perspective of the evidence. In his closing argument, he emphasized that no witnesses, photographs, or videos tied him to the gun. Even the DNA evidence was thin—found only on the trigger, and people do not wield guns strictly by the trigger. He asked the jury to acquit him because the evidence did not prove that he possessed the gun, directly or constructively, on September 20, 2019.

The jury returned a guilty verdict and the district court later sentenced Marzette to 36 months' imprisonment. He now appeals.

## II

Marzette asks us to resolve two—and only two—issues on appeal. We must first determine whether the district court abused its discretion when it admitted the DNA evidence

from the gun over Marzette's chain-of-custody objection. Second, we must resolve whether the district court committed plain error when it admitted Sergeant Baker's hearsay testimony about the 911 dispatch call. We address each contention in turn.

A

The district court did not abuse its discretion in rejecting Marzette's chain-of-custody objection. Chain of custody focuses on the sequence and integrity of the movement of evidence, from the time of its recovery to its presentation in court. See *United States v. Craig*, 573 F.2d 455, 478 (7th Cir. 1977). When the demonstrated chain of custody is "substantially complete" and there is no indication of evidence tampering or wrongdoing by those handling the evidence, we uphold the admission at trial. See *United States v. Lott*, 854 F.2d 244, 250–51 (7th Cir. 1988).

The government's chain-of-custody testimony cleared this low bar. Officer Watkins told the jury that he put on gloves, removed the gun from Rector's purse, then handed the firearm to another officer for evidence packaging and processing. An evidence specialist with the South Bend Police Department then testified to swabbing the inside of Marzette's cheek for DNA and providing that sample to the forensic DNA analyst. The analyst testified that Kelly Gorny, a forensics specialist who did not testify, swabbed the gun and tested that DNA against the sample collected from Marzette. Throughout their testimony, the officers and DNA specialists identified the appropriate person's signatures on the packaging and evidence logs at each link in the movement and processing of the evidence.

Marzette objected, contending that the evidence was unreliable because all officers who processed the DNA needed to testify to "support a finding that the item is what the [government] claims it is," thus establishing a complete chain of custody. Fed R. Evid. 901(a). The district court disagreed, finding that the government provided a substantially complete chain of custody.

Marzette faces an uphill battle on appeal. Establishing a complete chain of custody is a low threshold. See *Lott*, 854 F.2d at 250–51. Even more, when the government introduces physical evidence in a criminal case, we apply a "presumption of regularity"—by presuming that the officials who handled the evidence sufficiently followed standard procedures to ensure a proper chain of custody. *United States v. Prieto*, 549 F.3d 513, 524 (7th Cir. 2008) (internal quotation marks omitted). Missing links in the chain, if any, go to the weight a jury affords the evidence, not to its admissibility. See *id.* at 524–25.

The chain-of-custody evidence presented by the government satisfied these standards. Among its witnesses, the government presented an unbroken chain of custody. The testimony showed that from the moment the police saw the gun on top of Rector's purse in the backseat of the Malibu to the final stages of DNA processing, the evidence passed between officers according to standard protocols. Nothing at trial called the integrity of the chain of custody into question, nor did Marzette impeach this evidence through cross examination.

Marzette disagrees, suggesting that the government needed to call each custodian involved in the chain of custody. But the presumption of regularity applies even if the government does not call each custodian in the chain of

custody to testify about their discrete role in processing evidence. See *United States v. Turner*, 591 F.3d 928, 935 (7th Cir. 2010), *vacated on other grounds*, 567 U.S. 947 (2012). That is especially true where, as here, each officer identified the custodian's signatures on the custody seals and vouched for their accuracy. See Fed. R. Evid. 901(b)(2); *United States v. Tipton*, 964 F.2d 650, 655 (7th Cir. 1992). Absent any evidence of tampering, the government's chain-of-custody evidence receives a presumption of regularity. On this record, we cannot find that the district court abused its discretion.

B

That brings us to Marzette's challenge to the admissibility of Sergeant Baker's testimony of the 911 dispatch call describing the "people pounding at [the caller's door] waving guns." In Marzette's view, the government offered this testimony for the impermissible hearsay purpose of proving its truth—that in fact people pounded on an apartment door waving guns. See Fed. R. Evid. 802. Marzette concedes that he did not object to this testimony and therefore that our review is only for plain error. See *Puckett v. United States*, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred … during a federal judicial proceeding, he must object in order to preserve the issue.").

Federal Rule of Criminal Procedure 52(b) provides us with "a limited power to correct errors that were forfeited because not timely raised in district court." *United States v. Olano*, 507 U.S. 725, 73 (1993). On plain error review, Marzette must demonstrate that the admission of Sergeant Baker's statement was an error that is clear, and not subject to reasonable dispute. See *Puckett*, 556 U.S. at 135. Next, Marzette must show that the admission affected his substantial rights, meaning it

affected the outcome of his trial. See *id.* Finally, if these criteria are satisfied, we have the discretion to remedy the error only if it "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citing *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

The parties devoted substantial portions of their briefs to debating whether the first two criteria were met—whether allowing Sergeant Baker to recount the content of the 911 caller's statement was error, and, if so, whether the error was plain. Marzette presses the point on appeal because of the emphasis that the government placed on the 911 dispatch call at trial and implicated him in the disturbance at the apartment complex. The government, on the other hand, sees the statement as properly admitted for the non-hearsay purpose of merely explaining why the police officers were at the apartment complex in the first place. In its view, the 911 call provides helpful context for the jury's understanding of why the police pulled over the Chevy Malibu in the first place.

Both arguments have something to say for themselves, and, in the end, we do not need to resolve whether the district court committed error in admitting the 911 call through the backdoor of Sergeant Baker's testimony. Even if we assume the admission was error, we cannot conclude that Sergeant Baker's testimony about the 911 call affected the outcome of Marzette's trial. See *Olano*, 507 U.S. at 732–34.

Marzette's argument on appeal is very limited. He is not contesting that the government's evidence sufficed to show that he possessed the gun recovered from the backseat of the Malibu. Rather, his contention is that the district court's allowing Sergeant Baker to recount the 911 caller's request for help reflected such a substantial evidentiary error as to affect

the outcome of the trial and, even more, to seriously call into question the fairness and integrity of his trial. Marzette sees the 911 call as all but putting himself in the middle of armed confrontation at the LaSalle Park Homes complex on the evening of September 20, 2019.

We disagree. The jury had before it ample evidence showing that Marzette put himself in the middle of everything that led both to the police recovering the gun from the Malibu and the jury finding that he constructively possessed the gun. Yes, the jury heard the 911 caller's report, but it also heard Marzette's own statement that he showed up at the apartment complex because his sister had told him that people were outside her building waving guns. Marzette then made things worse for himself by continuing to make ill-advised, voluntary statements to the police. He tied himself to the Malibu by walking to the location of the car stop and then telling the police that he wanted to drive the car home because his name was on the rental agreement. And, going even further, he then told the police that they would not find his DNA on the gun—a statement that proved false.

All of this allowed the jury to find beyond any reasonable doubt that Marzette constructively possessed the gun recovered from the Malibu. That finding easily follows, the jury could have concluded, from the clear inferences available from the evidence: Marzette responded to his sister's call for help at her apartment by driving (or riding) there in the Malibu with his gun with him inside the car. Why take the gun? Because, as the jury could have determined, he may have needed it in confronting the armed contingent outside his sister's apartment.

Even if the district court should not have allowed Sergeant Baker to recount the 911 dispatch report, the jury had to look no further than Marzette himself and the results of the DNA testing to connect enough dots to return a guilty verdict. So even if it was an error to admit the dispatch call, the government could have presented effectively the same case with its exclusion. See *United States v. Marchan*, 935 F.3d 540, 546 (7th Cir. 2019) (holding that cumulative hearsay statements are harmless). Marzette thus failed to meet the demanding standards of plain error review. See *Puckett*, 556 U.S. at 135.

Based on the evidence before the jury, allowing Marzette's conviction to stand would not so detrimentally affect his rights as to call the entire fairness and integrity of the trial into question. We have little choice here but to AFFIRM.